## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 15-00432-5-DMW** |
| | § | |
| **ROADMARK CORPORATION,** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | |

### EMERGENCY MOTION OF DSCH CAPITAL PARTNERS, LLC D/B/A FAR WEST CAPITAL FOR ORDER (A) PROHIBITING USE OF NON-ESTATE PROPERTY HELD IN TRUST; AND (B) GRANTING RELIEF FROM THE AUTOMATIC STAY AND OTHER RELATED RELIEF

COMES NOW DSCH Capital Partners, LLC d/b/a Far West Capital ("Far West") to file this *Emergency Motion for Order (A) Prohibiting Use of Non-Estate Property; and (B) Granting Relief from the Automatic Stay and other Related Relief* (this "Motion"). In support, Far West would respectfully state as follows:

### INTRODUCTION

1.      As debtor's counsel has only recently acknowledged, debtor Roadmark Corporation collected and liquidated nearly half a million dollars' worth of Far West's collateral during the thirteen days prior to the Petition Date, treating the proceeds as its own. These actions—which were disclosed to Far West only *after* the interim hearing on the debtor's motion for cash collateral usage, and only *after* Far West had demanded an explanation for the disappearance of its collateral—were in stark defiance of the debtor's fiduciary duties to Far West. As a matter of law, all proceeds of accounts receivable that were collected by the debtor prior to the petition date were (and continue to be) held in trust for Far West's benefit, and do not constitute property of the estate. By this Motion, Far West requests an order prohibiting the debtor from making any further use of such

proceeds, and granting Far West relief from the stay to pursue all of its available remedies under applicable nonbankruptcy law—including, without limitation, making demand on customers of the debtor who paid the debtor despite having received a lawful notice that payment should be directed to Far West.

## BACKGROUND FACTS

2.      Debtor Roadmark Corporation ("Roadmark" or the "Debtor") instituted this chapter 11 proceeding by filing a voluntary petition on January 26, 2015 (the "Petition Date").    Roadmark remains in possession of its assets as a debtor and debtor-in-possession.

3.      As of the Petition Date, Roadmark was indebted to Far West in the amount of approximately $1.94 million pursuant to a certain *Loan and Security Agreement* dated July 7, 2014 (as amended the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached as Exhibit A.

4.      The Debtor's prepetition obligations under the Loan Agreement were and are secured by, among other things, a duly perfected, first-priority security interest on all of the Debtor's prepetition accounts receivable ("Accounts").   Under the terms of the Loan Agreement, Far West has the sole and exclusive right to collect Accounts, and it is mandatory for the Debtor to instruct its customers and counterparties ("Account Debtors") to make payment directly to Far West.  To the extent that Roadmark receives payment on any Accounts, the proceeds must be segregated from Roadmark's other assets and held in trust for Far West's benefit:

> **4.4  *Collection of Accounts.*** Borrower agrees that any and all Accounts must be collected through the lockbox arrangements required under this Section 4.4.  Any and all payments on, and proceeds of, Accounts received by

2

Borrower shall be held by Borrower in trust for Lender, and Borrower shall immediately deliver all such payments and proceeds to Lender in their original form, duly endorsed, to be applied to the Obligations in such order as Lender shall determine. From and after the Effective Date, all proceeds of Collateral shall be deposited by Borrower into a lockbox agreement in such form as Lender may specify in its good faith business judgment, and Borrower shall notify all Account Debtors to make all payments to the lockbox. Borrower's invoices, payment applications, and other similar documents evidencing the Accounts, shall have imprinted or stamped on the face thereof notifications of assignment and check remittance information indicating Lender's lock box address. Lender may also notify all Account Debtors to make all payments to such lockbox.

**4.5.** *Remittance of Proceeds.* All proceeds arising from the disposition of any Collateral shall be delivered, in kind, by Borrower to Lender in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower, to be applied to the Obligations in such order as Lender shall determine. Borrower agrees that it will not commingle proceeds of Collateral with any of Borrower's other funds or property, but will hold such proceeds separate and apart from such other funds and property and in an express trust for Lender. Nothing in this Section limits the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

Exhibit A (Loan Agreement) §§ 4.4, 4.5.

5.      On the Petition Date, Roadmark filed its *Emergency Motion For Authority To Use Cash Collateral* [Dkt. No. 11] (the "Cash Collateral Motion"). Far West filed a response to the Cash Collateral Motion on January 28, 2015 [*see* Dkt. No. 46], and opposed the Cash Collateral Motion at the interim hearing. As the Court will recall, Far West objected on the ground that the Cash Collateral Motion presented an inflated view of Far West's true collateral position; that the financial information in the Cash Collateral Motion contrasted sharply with the financial reports provided to Far West shortly before the Petition Date; and that the Debtor's proposed order did not include any financial

3

reporting that would enable Far West to track its collateral position throughout the case. *See* Dkt. No. 46, ¶¶ 5, 6, 14(a).

6.       On February 6, 2015, the Court entered its *Interim Order Granting Motion for Authority to Use Cash Collateral* [Dkt. No. 81] (the "Interim Order").    As an accommodation to Far West and other Objecting Parties (as defined in the Interim Order), the Court required the Debtor to furnish weekly financial reports, including but not limited to a weekly aging report showing bonded and nonbonded accounts receivable outstanding.

7.       On February 6, 2015, the debtor furnished its first weekly report pursuant to the Interim Order.  Over the next several business days, Far West compared this financial information (which was dated as of January 31) to similar financial information that had been provided to Far West prior to the Petition Date (which was dated as of January 13).   In comparing the two sets of financial reports, Far West was unable to determine what had happened to at least $545,000 of accounts receivable over that eighteen-day period. Accordingly, on February 11, 2015, Far West's counsel sent a letter to Roadmark's counsel outlining in detail the discrepancy that Far West had identified, and demanding an explanation.  A true and correct copy of the February 11 letter is attached hereto as Exhibit B.

8.       Two days later, on February 13, 2015, Roadmark's counsel provided a partial explanation for the missing collateral: during the 13-day period prior to the Petition Date, Roadmark had received $478,544.77 in payments on prepetition Accounts that Far West had the exclusive right to collect.  A true and correct copy of the letter from Roadmark's counsel is attached hereto as Exhibit C.

9.     Having received news that Roadmark had converted Far West's collateral to its own use, Far West's counsel immediately sent Roadmark's counsel a letter demanding that the Debtor (a) immediately cease and desist using funds (or proceeds of funds) that were held in trust as of the Petition Date; and (b) account for all such proceeds that remain. A true and correct copy of the letter is attached hereto as Exhibit D.

10.     The following Monday, February 16, 2015, Roadmark's counsel responded by asserting that no trust relationship had been created, and stating that the Debtor intends to continue using "its cash from receivables" pursuant to the Interim Order. A true and correct copy of the letter is attached hereto as Exhibit E.

## ARGUMENT AND AUTHORITIES

11.     "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990); *see also* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *Wolff v. United States (In re FirstPay, Inc.)*, __ F.3d __ (4th Cir. December 12, 2014).

12.     Because property interests are generally created and defined by state law, the Court must look to state law to determine whether property that existed as of the Petition Date constitutes "property of the estate." *See Butner v. U.S.*, 440 U.S. 48, 54-55 (1979); *Am. Bankers Ins. Co. of Fla. V. Maness*, 101 F.3d 358, 363 (4th Cir. 1996). In this case, the Loan Agreement provides that it is governed by Texas law. *See* Exhibit A,

Loan Agreement, § 10.9.  Accordingly, this Court must look to Texas law to determine whether a trust relationship existed.

13.    Generally speaking, Texas law recognizes three types of trusts: express trusts, resulting trusts, and constructive trusts. *Pickelner v. Adler*, 229 S.W.3d 516, 525-26 (Tex. App.—Houston [1st Dist.] 2007), *citing Mills v. Gray,* 210 S.W.2d 985, 987 (Tex. 1948).  By statute, an express trust may be created in one of several ways, including "a property owner's declaration that the owner holds the property as trustee for another person."  Tex. Prop. Code Ann. § 112.001(1).    There are no technical words of expression necessary to create an express trust. *See Pickelner,* 229 S.W.3d at 526 (citing *Perfect Union Lodge No. 10, A.F. & A.M., of San Antonio v. Interfirst Bank of San Antonio, N.A.,* 748 S.W.2d 218, 220 (Tex. 1988)); *see also Barrientos v. Nava,* 94 S.W.3d 270, 280 (Tex. App.-Houston [14th Dist.] 2002, no pet.) ("No particular form of words is required to create a trust.").  In fact, there are only three fundamental elements to the creation of an express trust: (1) the words of the settlor are imperative, imposing a duty on the trustee, (2) the property that is subject to the trust is clearly defined, and (3) the person intended to be the beneficiary is clearly identified. *See Unthank v. Rippstein*, 386 S.W.2d 134, 136 (Tex.1964); *Pickelner,* 229 S.W.3d at 526; *Brelsford v. Scheltz,* 564 S.W.2d 404, 406 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.); *Roberts v. Squyres,* 4 S.W.3d 485, 489 (Tex.App.-Beaumont 1999, pet. denied).

14.    In this case, the Loan Agreement signed by Roadmark and Far West manifests a clear intention to create a trust relationship with respect to any payments received by Roadmark on the Accounts.  Far West is granted the sole and exclusive right to collect the Accounts.  In the event that Roadmark (accidentally or otherwise) receives

6

payment on any of the Accounts, the funds: (a) must be *immediately* turned over to Far West; (b) must be held in a separate account and may not be commingled with other property; and (c) are held in an express trust for Far West's benefit. The language is imperative; the property that is subject to the trust is clear; and there is no mistaking the identity of the beneficiary. All of the elements of an express trust under Texas law are present.

15.     Roadmark's position, apparently, is that a trust relationship cannot arise out of a secured transaction, even when the parties' intent to create such a trust is perfectly clear. *See* Exhibit E (February 16, 2015 letter from Debtor's counsel). As support for this position, Roadmark cites a solitary 1934 Supreme Court decision that is outdated, factually distinguishable and legally immaterial.[1] This argument is little more than a desperate effort to justify a knowing breach of fiduciary duty, and it fails as a matter of law.

16.     Under applicable Texas law, there is no question that parties to a secured transaction can establish a trust / fiduciary relationship regarding the collection of collateral. For example, in *Little v. State*, 699 S.W.2d 316, 318 (Tex. App.—San Antonio 1985), the appellate court upheld a borrower's conviction for criminal misapplication of fiduciary property, based on a borrower's violation of trust provisions that closely mirror those at issue here. The security agreements in *Little* read as follows:

> All proceeds in the form of cash and negotiable instruments for the payment of money received by Debtor [appellant] in payment of any of the

---

[1] The case is *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934). The case pre-dates the Bankruptcy Code and the Uniform Commercial Code, but it was decided under Illinois law as it existed at the time. *See id.* at 334. More importantly, the Court did not hold that a trust relationship can never be created in connection with a secured transaction, but simply found that no such relationship existed on the facts before it. *See id.* at 333-334.

> assigned Accounts or Contract Rights will be *held in trust* for Secured Party and *promptly paid over to Secured Party for application upon the indebtedness of Debtor* to Secured Party, the order and method of application to be in the sole discretion of Secured Party.

*See Little,* 699 S.W.2d at 318 (quoting security agreements; emphasis added by court). Based on the language quoted above, the Court upheld the conviction based in part on a finding that the debtor "owed a duty to the bank to hold certain funds (proceeds of specific accounts receivable) in trust for the bank and to pay the funds to the bank." *Id.* If a fiduciary obligation of this type is strong enough to support a criminal conviction, it ought to be strong enough to be recognized in civil disputes such as this.

17.    In a case originating in Texas, the Fifth Circuit has also explicitly recognized that trusts can arise out of debtor-creditor relationships, provided that the creditor is not merely relying on "talismanic" language and can point to mechanisms that actually show an intent to create a trust. *In re Sakowitz, Inc.*, 949 F.2d 178, 182-83 (5th Cir. 1991). Such mechanisms—like a prohibition on commingling of funds, and a requirement that trust funds be immediately paid over to the beneficiary—were found to be lacking in *Sakowitz,* but are clearly present in this case.

18.    Further, even if the parties' attempt to create an express trust were to fail for some reason, Texas law would imply a resulting trust or a constructive trust in order to prevent unjust enrichment. *See, e.g., Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 250 (Tex. 1984) ("The doctrine of resulting trust is invoked to prevent unjust enrichment, and equitable title will rest with the party furnishing the . . . trust property when an express trust fails."); *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied) ("A constructive trust is a relationship with respect to

8

property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." (quoting *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158, 160 (1943)).  Here, Roadmark—in brazen disregard of its promise to hold proceeds of the Accounts in trust and to pay them over to Far West—willfully diverted, and converted to its own use, nearly a half-million dollars' worth of proceeds in the thirteen days prior to its bankruptcy filing.  Enrichment could hardly be more unjust.

19.    Accordingly, under these circumstances, Texas law recognizes a trust relationship per the plain language of the Loan Agreement (*i.e.*, an express trust) and pursuant to longstanding equitable principles (*i.e.*, a resulting trust or a constructive trust).  Regardless of the classification, however, the result is the same: the equitable interest in the trust funds is not "property of the estate" under Section 541(d) of the Bankruptcy Code.  *See, e.g., In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993), *cert. denied* 114 S.Ct. 1050 (1994) ("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust.").

### A.    The Debtor Is Not Entitled to Use Trust Property, And Far West Is Entitled To An Order Prohibiting It From Doing So

20.    Property that does not constitute "property of the estate" is outside the purview of Section 363 of the Bankruptcy Code, and may not be used, sold or leased by the debtor-in-possession.  *See* 11 U.S.C. § 363(c)(1) (ordinary course transactions); 11 U.S.C. § 363(b)(1) (transactions outside the ordinary course of business); *compare Columbia Gas, supra*, 997 F.2d at 1058-59, note 6 ("If the debtor holds the customer

refunds in constructive trust, these funds are excluded from the debtor's bankruptcy estate and are *immediately payable to its customers*." (emphasis added)).

21.     By all appearances, Roadmark misappropriated nearly half a million dollars' worth of Far West's property in order to fund its chapter 11 case.  If the Court allows the Debtor to do so, it will establish a horrifying precedent from the perspective of any secured lender.  The Debtor and Far West had an explicit prepetition agreement intended to give Far West practical control of its collateral.  The Debtor had no right to collect the Accounts, and the Loan Agreement mandated that all payments on the Accounts be directed to Far West.  Such agreements are common in the commercial lending world, and are expressly contemplated by Article 9 of the UCC.  *See, e.g.,* N.C.G.S. § 25-9-607(a) (with the debtor's consent, secured party may notify account debtors to make direct payment to the secured party, even in the absence of a default on the loan); N.C.G.S. § 25-9-406(a) (after receiving such a notification, the account debtor may discharge its obligation on the account receivable only by paying the secured party).

22.     Wanton conversion of collateral is not a pre-bankruptcy planning tool, nor should it become one.  Based on the foregoing authorities, Far West respectfully requests an order prohibiting the Debtor from using Far West's trust property, and requiring the Debtor to account for all proceeds of the same.

**B.     *Regardless of Any Trust Relationship, Far West Should Be Allowed To Enforce Its Nonbankruptcy Rights Against Account Debtors Who Paid Roadmark Over Notice***

23.     In the world of asset-based finance, the term "paying over notice" refers to the situation where an account debtor (*e.g.*, a customer of Roadmark) makes payment on an account directly to its vendor (*e.g.*, Roadmark) after receiving a lawful notice that

payment should be made to the vendor's secured party (*e.g.,* Far West). As indicated above, the UCC generally provides that payment over notice does not discharge an account debtor from the underlying obligation. *See, e.g.,* N.C.G.S. § 25-9-406(a); Tex. Bus. Comm. Code § 9.406(a). In other words, the UCC explicitly provides that an account debtor who "pays over notice" may be subject to double liability.

24.     Far West respectfully submits that the automatic stay, 11 U.S.C. § 362, does not prevent Far West from enforcing its collection rights against account debtors who paid over notice. For one thing, the automatic stay generally does not protect nondebtor third parties. *See, e.g., Winters v. George Mason Bank,* 94 F.3d 130, 133-34 (4th Cir. 1996) (discussing the general rule that the automatic stay does not apply to third parties). For another, the Debtor has already collected from the applicable account debtors, and therefore there can be no pretense that Far West is seeking to take control or possession of estate property. *See* 11 U.S.C. § 362(a)(3) – (5). In an abundance of caution, however, Far West requests an order confirming that the automatic stay does not prevent Far West from making collection demands on account debtors who paid over notice prior to the Petition Date.

25.     Further, even if the automatic stay does apply, Far West should be granted relief from the stay to pursue account debtors who paid over notice prior to the Petition Date. Section 362(d)(1) of the Code provides that the Court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property[.]" 11 U.S.C. § 362(d)(1). Clearly, Far West's interest in property is not protected, because the Debtor is in continuing and knowing violation of its fiduciary obligations with respect to the collection of such property. Likewise, Section 362(d)(2) of the Code provides that

the Court shall grant relief from the stay with respect to an action against property if the Debtor has no equity in the property, and the property is not necessary to an effective reorganization.  11  11 U.S.C. § 362(d)(2).  Both of these elements are satisfied as a matter of law where, as here, the property in question is held in trust and the debtor has neither an equitable interest in the funds, nor the right to use them in connection with this case.  *See, e.g, Columbia Gas, supra*, 997 F.2d at 1058-59, note 6 ("If the debtor holds the customer refunds in constructive trust, these funds are excluded from the debtor's bankruptcy estate and are immediately payable to its customers.").

26.     For each of the foregoing reasons, the automatic stay does not prevent Far West from enforcing its collection rights against account debtors who paid over notice prior to the Petition Date, and even if it did, Far West is entitled to relief from the stay pursuant to Sections 362(d)(1) and (d)(2).

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Far West requests that the Court enter one or more orders: (a) suspending the Interim Order on cash collateral usage; (b) prohibiting the Debtor, Roadmark Corporation, from using, spending, disposing of or dissipating any funds that may constitute proceeds of the prepetition Accounts wrongfully collected by the Debtor; (c) requiring the Debtor, Roadmark Corporation, to immediately account for such proceeds and to identify any such proceeds that remain; (d) confirming that the automatic stay does not prevent Far West from enforcing its collection rights against account debtors who paid the Debtor over notice prior to the Petition Date, or, alternatively, granting Far West relief from the stay so that it may do so; and (e) granting Far West such other and further relief to which it may show itself justly entitled.

Respectfully submitted this 19th day of February, 2015.

SCHOBER & SCHOBER, PC


By: *s/James M. Schober*
James M. Schober
Texas Bar No. 24004907
Teresa Ruiz Schober
Texas Bar No. 24005353
400 W. 15th St., Suite 404
Austin, Texas 78701
Telephone: (512) 474-7678
Facsimile: (512) 498-1333

ATTORNEYS FOR DSCH  CAPITAL
PARTNERS, LLC D/B/A    FAR    WEST
CAPITAL

GERALD A. JEUTTER, JR.,
ATTORNEY AT LAW, P.A.

By: *s/Gerald A. Jeutter, Jr.*
Gerald A. Jeutter, Jr.
North Carolina State Bar No. 17724
615 Oberlin Road, Suite 102
Post Office Box 12585
Raleigh, North Carolina 27605
Telephone No. 919-334-6631
Fax No. 919-833-9793
E-mail: jeb@jeutterlaw.com
Local Civil Rule 83.1 Counsel

# Loan and Security Agreement

**Borrower:**

**Roadmark Corporation,**
**a North Carolina corporation**
**900 E. C Street**
**Butner, NC 27509**

**Date:** Jul 7, 2014          **(the "Effective Date")**

**THIS LOAN AND SECURITY AGREEMENT** (the "Agreement") is entered into on the above date between DSCH Capital Partners, LLC, d/b/a Far West Capital, a Texas limited liability company ("Lender"), whose address is 4601 Spicewood Springs Rd., Building 2, Suite 200, Austin, Texas 78759, and the borrower named above, whose chief executive office is located at the above address ("Borrower's Address"). The Schedule to this Agreement (the "Schedule") shall for all purposes be deemed to be a part of this Agreement, and the same is an integral part of this Agreement. (Definitions of certain terms used in this Agreement are set forth in Section 8 below.)

## 1.  LOANS.

**1.1  Loans.** Lender will make loans to Borrower (the "Loans"), in amounts determined by Lender in its good faith business judgment, up to the amounts (the "Credit Limit") shown on the Schedule, provided no Default or Event of Default has occurred and is continuing, and subject to deduction of Reserves for accrued interest and such other Reserves as Lender deems proper from time to time in its good faith business judgment.

**1.2  Interest.** All Loans and all other monetary Obligations shall bear interest at the rate shown on the Schedule, except where expressly set forth to the contrary in this Agreement. Accrued interest shall be payable monthly, on the last day of the month, and shall be charged to Borrower's loan account (and the same shall thereafter bear interest at the same rate as the other Loans).

**1.3  Overadvances.** If at any time or for any reason the total of all outstanding Loans and all other monetary Obligations exceeds the Credit Limit (an "Overadvance"), Borrower shall immediately pay the amount of the excess to Lender, without notice or demand. Without limiting Borrower's obligation to repay to Lender the amount of any Overadvance, Borrower agrees to pay Lender interest on the outstanding amount of any Overadvance, on demand, at the Default Rate.

**1.4  Fees.** Borrower shall pay Lender the fees shown on the Schedule, which are in addition to all interest and other sums payable to Lender and are not refundable.

**1.5  Loan Requests.** Subject to all conditions and terms contained herein such as the delivery of a Borrowing Base Certificate in a form acceptable to Lender with respect to each Loan, to obtain a Loan, Borrower shall make a request to Lender by facsimile, telephone, or electronic mail, such request to provide Lender with at least one Business Day's notice. Loan requests received after 12:00 PM (Central Time) will not be considered by Lender until the next Business Day. Lender may rely on any facsimile, electronic mail or telephone request for a Loan given by a person whom Lender believes is an authorized representative of Borrower, and Borrower will indemnify Lender for any loss Lender suffers as a result of that reliance.

## 2.  SECURITY INTEREST.

To secure the payment and performance of all of the Obligations when due, Borrower hereby grants to Lender a security interest in all of the following (collectively, the "Collateral"): all right, title and interest of Borrower in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Payment Intangibles and Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of

FWC                                                                    Loan and Security Agreement

the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Borrower's books relating to any and all of the above.

### 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER.

In order to induce Lender to enter into this Agreement and to make Loans, Borrower represents and warrants to Lender as follows, and Borrower covenants that the following representations will continue to be true, and that Borrower will at all times comply with all of the following covenants, throughout the term of this Agreement and until all Obligations have been paid and performed in full:

*3.1 Corporate Existence and Authority.* Borrower is and will continue to be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization. Borrower is and will continue to be qualified and licensed to do business in all jurisdictions in which any failure to do so would result in a Material Adverse Change. The execution, delivery and performance by Borrower of this Agreement, and all other documents contemplated hereby (i) have been duly and validly authorized, (ii) are enforceable against Borrower in accordance with their terms (except as enforcement may be limited by equitable principles and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to creditors' rights generally), and (iii) do not violate Borrower's articles or certificate of incorporation, or Borrower's by-laws, Borrower's partnership agreement or operating agreement (as the case may be), or any law or any material agreement or instrument which is binding upon Borrower or its property, and (iv) do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property.

*3.2 Name; Trade Names and Styles.* The name of Borrower set forth in the heading to this Agreement is its correct name. Listed in the Representations are all prior names of Borrower and all of Borrower's present and prior trade names. Borrower shall give Lender 30 days' prior written notice before changing its name or doing business under any other name. Borrower has complied, and will in the future comply, in all material respects, with all laws relating to the conduct of business under a fictitious business name.

*3.3 Place of Business; Location of Collateral.* The address set forth in the heading to this Agreement is Borrower's chief executive office. In addition, Borrower has places of business and Collateral is located only at the locations set forth in the Representations. Borrower will give Lender at least 30 days prior written notice before opening any additional place of business, changing its chief executive office, or moving any of the Collateral to a location other than Borrower's Address or one of the locations set forth in the Representations, without Lender's prior written consent.

*3.4 Title to Collateral; Perfection; Permitted Liens.*

(a) Borrower is now, and will at all times in the future be, the sole owner of all the Collateral, except for items of Equipment which are leased to Borrower. The Collateral now is and will remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims, except for Permitted Liens. Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, subject only to Permitted Liens, and Borrower will at all times defend Lender and the Collateral against all claims of others.

(b) Borrower has set forth in the Representations all of Borrower's Deposit Accounts, and Borrower will give Lender five Business Days advance written notice before establishing any new Deposit Accounts and will cause the institution where any such new Deposit Account is maintained to execute and deliver to Lender a control agreement in form sufficient to perfect Lender's security interest in the Deposit Account and otherwise satisfactory to Lender in its good faith business judgment.

(c) In the event that Borrower shall at any time after the date hereof have any commercial tort claims against others, which it is asserting or intends to assert, and in which the potential recovery exceeds $25,000, Borrower shall promptly notify Lender thereof in writing and provide Lender with such information regarding the same as Lender shall request. Such notification to Lender shall constitute a grant of a security interest in the commercial tort claim and all proceeds thereof to Lender, and Borrower shall execute and deliver all such documents and take all such actions as Lender shall request in connection therewith.

(d) None of the Collateral now is or will be affixed to any real property in such a manner, or with such intent, as to become a fixture. Borrower is not and will not become a lessee under any real property lease pursuant to which the lessor may obtain any rights in any of the Collateral and no such lease now prohibits, restrains, impairs or will prohibit, restrain or impair Borrower's right to remove any Collateral from the leased premises. Whenever any Collateral is located upon real property in which any third party has an interest, Borrower shall, whenever requested by Lender, cause such third party to execute and deliver to Lender, in form acceptable to Lender, such waivers and subordinations as Lender shall specify. Borrower will keep in full force and effect, and will comply with all terms of, any lease of real property where any of the Collateral now or in the future may be located.

*3.5 Maintenance of Collateral.* Borrower will maintain the Collateral in good working condition (ordinary wear and tear excepted), and Borrower will not

<u>EXHIBIT A</u>

use the Collateral for any unlawful purpose. Borrower will immediately advise Lender in writing of any material loss or damage to the Collateral.

**3.6 Books and Records.** Borrower has maintained and will maintain at Borrower's Address complete and accurate books and records, comprising an accounting system in accordance with GAAP.

**3.7 Financial Condition, Statements and Reports.** All financial statements now or in the future delivered to Lender have been, and will be, prepared in conformity with GAAP and now and in the future will fairly present the results of operations and financial condition of Borrower, in accordance with GAAP, at the times and for the periods therein stated. Between the last date covered by any such statement provided to Lender and the date hereof, there has been no Material Adverse Change.

**3.8 Tax Returns and Payments; Pension Contributions.** Borrower has timely filed, and will timely file, all required tax returns and reports, and Borrower has timely paid, and will timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions now or in the future owed by Borrower. Borrower may, however, defer payment of any contested taxes, provided that Borrower (i) in good faith contests Borrower's obligation to pay the taxes by appropriate proceedings promptly and diligently instituted and conducted, (ii) notifies Lender in writing of the commencement of, and any material development in, the proceedings, and (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a lien upon any of the Collateral. Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower. Borrower has paid, and shall continue to pay all amounts necessary to fund all present and future pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not and will not withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower.

**3.9 Compliance with Law.** Borrower has complied, and will comply, in all respects, with all provisions of all foreign, federal, state and local laws and regulations applicable to Borrower, including, but not limited to, those relating to Borrower's ownership of real or personal property, the conduct and licensing of Borrower's business, and all environmental matters.

**3.10 Litigation.** There is no claim, suit, litigation, proceeding or investigation pending or threatened against or affecting Borrower in any court or before any governmental agency (or any basis therefor known to Borrower) except those listed in the Representations. Borrower will promptly inform Lender in writing of any

claim, proceeding, litigation or investigation in the future threatened or instituted against Borrower.

**3.11 Use of Proceeds.** All proceeds of all Loans shall be used solely for Borrower's working capital. Borrower is not purchasing or carrying any "margin stock" (as defined in Regulation G of the Board of Governors of the Federal Reserve System) and no part of the proceeds of any Loan will be used to purchase or carry any "margin stock" or to extend credit to others for the purpose of purchasing or carrying any "margin stock."

## 4. ACCOUNTS.

**4.1 Representations Relating to Accounts and Inventory.**

(a) Borrower represents and warrants to Lender as follows: Each Account with respect to which Loans are requested by Borrower shall, on the date each Loan is requested and made, (i) represent an undisputed bona fide existing unconditional obligation of the Account Debtor created by the sale, delivery, and acceptance of goods or the rendition of services and (ii) meet the Minimum Eligibility Requirements set forth in Section 8 below.

(b) Borrower represents and warrants to Lender as follows: (i) All Eligible Inventory is of good and merchantable quality, free from defects; and (ii) as to each item of Inventory that is identified by Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to Lender, such Inventory is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Inventory.

**4.2 Representations Relating to Documents and Legal Compliance.** Borrower represents and warrants to Lender as follows: All statements made and all unpaid balances appearing in all invoices, payment applications, instruments and other documents evidencing the Accounts are and shall be true and correct and all such invoices, payment applications, instruments and other documents and all of Borrower's books and records are and shall be genuine and in all respects what they purport to be. All sales and other transactions underlying or giving rise to each Account shall comply in all material respects with all applicable laws and governmental rules and regulations. To the best of Borrower's knowledge, all signatures and endorsements on all documents, instruments, and agreements relating to all Accounts are and shall be genuine, and all such documents, instruments and agreements are and shall be legally enforceable in accordance with their terms.

**4.3 Schedules and Documents relating to Accounts.** Borrower shall deliver to Lender transaction reports and schedules of collections, as provided in the Schedule, on Lender's standard forms; provided, however, that Borrower's failure to execute and deliver the same shall not affect or limit Lender's security interest and other rights in all of Borrower's Accounts, nor shall Lender's failure to advance or lend against a specific Account

<u>EXHIBIT A</u>

FWC                                                                           Loan and Security Agreement

affect or limit Lender's security interest and other rights therein. If requested by Lender, Borrower shall furnish Lender with copies (or, at Lender's request, originals) of all contracts, orders, invoices, payment applications, and other similar documents, and all shipping instructions, delivery receipts, bills of lading, and other evidence of delivery, for any goods the sale or disposition of which gave rise to such Accounts, and Borrower warrants the genuineness of all of the foregoing. Borrower shall also furnish to Lender an aged accounts receivable trial balance as provided in the Schedule. In addition, Borrower shall deliver to Lender, on its request, the originals of all instruments, chattel paper, security agreements, guarantees and other documents and property evidencing or securing any Accounts, in the same form as received, with all necessary indorsements, and copies of all credit memos.

**4.4  Collection of Accounts.** Borrower agrees that any and all Accounts must be collected through the lockbox arrangements required under this Section 4.4. Any and all payments on, and proceeds of, Accounts received by Borrower shall be held by Borrower in trust for Lender, and Borrower shall immediately deliver all such payments and proceeds to Lender in their original form, duly endorsed, to be applied to the Obligations in such order as Lender shall determine. From and after the Effective Date, all proceeds of Collateral shall be deposited by Borrower into a lockbox account, pursuant to a lockbox agreement in such form as Lender may specify in its good faith business judgment, and Borrower shall notify all Account Debtors to make all payments to the lockbox. Without limiting the generality of the foregoing, Borrower's invoices, payment applications, and other similar documents evidencing the Accounts, shall have imprinted or stamped on the face thereof notifications of assignment and check remittance information indicating Lender's lock box address. Lender may also notify all Account Debtors to make all payments to such lockbox.

**4.5.  Remittance of Proceeds.** All proceeds arising from the disposition of any Collateral shall be delivered, in kind, by Borrower to Lender in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower, to be applied to the Obligations in such order as Lender shall determine. Borrower agrees that it will not commingle proceeds of Collateral with any of Borrower's other funds or property, but will hold such proceeds separate and apart from such other funds and property and in an express trust for Lender. Nothing in this Section limits the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

**4.6  Disputes.** Borrower shall notify Lender promptly of all disputes or claims exceeding $10,000.00 relating to Accounts. Borrower shall not forgive (completely or partially), compromise or settle any Account for less than payment in full, or agree to do any of the foregoing, without the prior written consent of Lender.

**4.7  Returns.** Provided no Event of Default has occurred and is continuing, if any Account Debtor returns any Inventory to Borrower, Borrower shall promptly determine the reason for such return and promptly issue a credit memorandum to the Account Debtor in the appropriate amount. In the event any attempted return occurs after the occurrence and during the continuance of any Event of Default, Borrower shall hold the returned Inventory in trust for Lender, and immediately notify Lender of the return of the Inventory.

**4.8  Verification.** Lender may, from time to time, verify directly with the respective Account Debtors the validity, amount and other matters relating to the Accounts, by means of mail, telephone or otherwise, either in the name of Borrower or Lender or such other name as Lender may choose, and Lender or its designee may, at any time, notify Account Debtors that it has a security interest in the Accounts.

**4.9  No Liability.** Lender shall not be responsible or liable for any shortage or discrepancy in, damage to, or loss or destruction of, any goods, the sale or other disposition of which gives rise to an Account, or for any error, act, omission, or delay of any kind occurring in the settlement, failure to settle, collection or failure to collect any Account, or for settling any Account in good faith for less than the full amount thereof, nor shall Lender be deemed to be responsible for any of Borrower's obligations under any contract or agreement giving rise to an Account.

**5.  ADDITIONAL DUTIES OF BORROWER.**

**5.1  Financial and Other Covenants.** Borrower shall at all times comply with the financial and other covenants set forth in the Schedule.

**5.2  Insurance.** Borrower shall, at all times insure all of the tangible personal property Collateral and carry such other business insurance, with insurers reasonably acceptable to Lender, in such form and amounts as Lender may require in its good faith business judgment, and Borrower shall provide evidence of such insurance to Lender. All such insurance policies shall name Lender as the exclusive loss payee, and shall contain a lenders loss payee endorsement in form reasonably acceptable to Lender. Upon receipt of the proceeds of any such insurance, Lender shall apply such proceeds in reduction of the Obligations as Lender shall determine in its good faith business judgment. If Borrower fails to provide or pay for any insurance, Lender may, but is not obligated to, obtain the same at Borrower's expense. Borrower shall promptly deliver to Lender copies of all material reports made to insurance companies.

**5.3  Reports.** Borrower, at its expense, shall provide Lender with the written reports set forth in the Schedule, and such other written reports with respect to Borrower

<u>EXHIBIT A</u>

FWC                                                                      Loan and Security Agreement

as Lender shall from time to time specify in its good faith business judgment.

**5.4   Access to Collateral, Books and Records/Site Visits.**   At reasonable times, and on one Business Day's notice, Lender, or its agents, shall have the right to inspect the Collateral, and the right to audit and copy Borrower's books and records. Such inspections or audits shall be conducted no more often than four times during each calendar year, but nothing herein restricts Lender's right to conduct such audits more frequently if (i) Lender believes that it is advisable to do so in Lender's good faith business judgment, or (ii) Lender believes in good faith that a Default or Event of Default has occurred.   The foregoing inspections and audits shall be at Borrower's expense and the charge therefor shall be $850 per person per day (or such higher amount as shall represent Lender's then current standard charge for the same), plus reasonable out-of-pocket expenses.  In addition, Lender shall be entitled to conduct semi-annual field exams at such locations it deems reasonable in its sole discretion.

**5.5   Negative Covenants.**   Except as may be permitted in the Schedule, Borrower shall not, without Lender's prior written consent (which shall be a matter of its good faith business judgment), do any of the following:

(i)    merge or consolidate with another corporation or entity;

(ii)    acquire any assets, except in the ordinary course of business;

(iii)    enter into any other transaction outside the ordinary course of business;

(iv)    sell or transfer any Collateral, except for the sale of finished Inventory in the ordinary course of Borrower's business;

(v)    store any Inventory or other Collateral with any warehouseman or other third party;

(vi)    sell any Inventory on a sale-or-return, guaranteed sale, consignment, or other contingent basis;

(vii)    make any loans of any money or other assets or make any other Investments, other than Permitted Investments;

(viii)    make any loans of any money or other assets or cash or capital contributions or make any other Investments, other than Permitted Investments, to Affiliates;

(ix) satisfy by payment any loans or other monetary obligations to any Affiliate, without the prior written consent of Lender;

(x)    create, incur, assume or permit to be outstanding any Indebtedness other than (a) the Obligations, (b) trade payables and other contractual obligations to suppliers and customers incurred in the ordinary course of business, and (c) any existing

Indebtedness owing to certain Affiliates outlined in Section 8(a) of the Schedule;

(xi)    guarantee or otherwise become liable with respect to the obligations of another party or entity;

(xii)    other than distributions or other payments intended to satisfy income tax liability passed through to (and due and payable by) Borrower's shareholders, pay or declare any dividends on, or distributions with respect to Borrower's stock (except for dividends payable solely in stock of Borrower), or make any other distributions, directly or indirectly, with respect to any equity interest in Borrower;

(xiii) redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrower's stock or other equity securities;

(xiv)    sell or further encumber, assign, lien or otherwise create any new security interest in any real property owned by Borrower;

(xv)    engage, directly or indirectly, in any business other than the businesses currently engaged in by Borrower or reasonably related thereto; or

(xvi)    dissolve or elect to dissolve.

Transactions permitted by the foregoing provisions of this Section are only permitted if no Default or Event of Default has occurred and is continuing, or would occur as a result of such transaction.

**5.6   Litigation Cooperation.**   Should any third-party suit or proceeding be instituted by or against Lender with respect to any Collateral or relating to Borrower, Borrower shall, without· expense to Lender, make available Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

**5.7   Notification of Changes.**   Borrower will promptly notify Lender in writing of (i) any change in its officers or directors, and (ii) any Material Adverse Change.

**5.8   Further Assurances.**   Borrower agrees, at its expense, on request by Lender, to execute all documents and take all actions, as Lender, may, in its good faith business judgment, deem necessary or useful in order to perfect and maintain Lender's perfected first-priority security interest in the Collateral (subject only to Permitted Liens), and in order to fully consummate the transactions contemplated by this Agreement.

**6.   TERM.**

**6.1   Maturity Date.**   This Agreement shall continue in effect until the maturity date set forth on the Schedule, unless automatically renewed and extended hereunder (as from time to time extended and renewed, the "Maturity Date"), subject to Section 6.3 below.   This Agreement shall be automatically extended and renewed for

**EXHIBIT A**

successive one-year terms, following the initial term, unless notice of non-renewal is received by Lender not less than ninety (90) days prior to the Maturity Date, as further described in Section 4 of the Schedule.

### 6.2 Early Termination.

(a) Early Termination by Lender. This Agreement may be terminated prior to the Maturity Date by Lender, without notice, effective immediately, if an Event of Default has occurred or is continuing.

(b) Early Termination by Borrower. If this Agreement is terminated by Borrower prior to the Maturity Date, Borrower shall pay to Lender a termination fee in an amount equal to the interest and fees accrued for the three-month period prior to the termination date. The termination fee shall be due and payable on the effective date of termination and thereafter shall bear interest at a rate equal to the highest rate applicable to any of the Obligations.

### 6.3 Payment of Obligations.
On the Maturity Date or on any earlier effective date of termination, Borrower shall pay and perform in full all Obligations, whether evidenced by installment notes or otherwise, and whether or not all or any part of such Obligations are otherwise then due and payable. Notwithstanding any termination of this Agreement, all of Lender's security interests in all of the Collateral and all of the terms and provisions of this Agreement shall continue in full force and effect until all Obligations have been paid and performed in full; provided that Lender may, in its sole discretion, refuse to make any further Loans after termination. No termination shall in any way affect or impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any Obligation to Lender, until all of the Obligations have been paid and performed in full. Upon payment and performance in full of all the Obligations, termination of this Agreement, and execution and delivery by Borrower to Lender of a general release on Lender's standard form, identical or similar in form to that attached hereto as Exhibit "A," Lender shall promptly terminate its financing statements with respect to the Borrower and deliver to Borrower such other documents as may be required to fully terminate Lender's security interests. Notwithstanding any such termination, the indemnity provisions of this Agreement shall continue in full force and effect.

### 7. EVENTS OF DEFAULT AND REMEDIES.

### 7.1 Events of Default.
The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement if such event(s) remains uncured after seven days' written notice to Lender, provided, however, that if Lender determines, in its sole discretion, that such event either involves or is the result of fraud on the part of Borrower or is so egregious and time-sensitive as to materially prejudice the Collateral or Lender's ability to receive payment of the Obligations, Borrower shall not be entitled to notice of default or any period in which to cure any default:

(a) Any warranty, representation, statement, report or certificate made or delivered to Lender by Borrower or any of Borrower's officers, employees or agents, now or in the future, shall be untrue or misleading in a material respect when made or deemed to be made; or

(b) Borrower shall fail to pay when due any Loan or any interest thereon or any other monetary Obligation; or

(c) Borrower shall fail to pay any Indebtedness when due;

(d) the total Loans and other Obligations outstanding at any time shall exceed the Credit Limit; or

(e) Borrower shall fail to comply with any of the financial covenants set forth in the Schedule, or shall fail to perform any other non-monetary Obligation which by its nature cannot be cured, or shall fail to permit Lender to conduct an inspection or audit as specified in Section 5.4 hereof; or

(f) Borrower shall fail to perform any other non-monetary Obligation, which failure is not cured within five Business Days after the date due; or

(g) any levy, assessment, attachment, seizure, lien or encumbrance (other than a Permitted Lien) is made on all or any part of the Collateral which is not cured within 10 days after the occurrence of the same; or

(h) any default or event of default occurs under any obligation secured by a Permitted Lien, which is not cured within any applicable cure period or waived in writing by the holder of the Permitted Lien; or

(i) Borrower breaches any material contract or obligation, which has resulted or in Lender's good faith business judgment may reasonably be expected to result in a Material Adverse Change; or

(j) Dissolution, termination of existence, temporary or permanent suspension of business, insolvency or business failure of Borrower or any Guarantor; or appointment of a receiver, trustee or custodian, for all or any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding by Borrower or any Guarantor under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect

(k) the commencement of any proceeding against Borrower or any Guarantor under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, which is not cured by the dismissal thereof within 30 days after the date commenced; or

**EXHIBIT A**

(l)  revocation or termination of, or limitation or denial of liability upon, any guaranty of the Obligations or any attempt to do any of the foregoing, or death of any Guarantor; or

(m)  revocation or termination of, or limitation or denial of liability upon, any pledge of any certificate of deposit, securities or other property or asset of any kind pledged by any third party to secure any or all of the Obligations, or any attempt to do any of the foregoing, or commencement of proceedings by or against any such third party under any bankruptcy or insolvency law; or

(n)  Borrower makes any payment on account of any indebtedness or obligation which has been subordinated to the Obligations other than as permitted in the applicable subordination agreement, or if any Person who has subordinated such indebtedness or obligations terminates or in any way limits his subordination agreement; or

(o)  there shall be a change in the record or beneficial ownership of an aggregate of more than 20% of the outstanding shares of stock of, or equity ownership interest in, Borrower, in one or more transactions, compared to the ownership of-the same in effect on the date hereof, without the prior written consent of Lender; or

(p)  there shall be a change in the President, Chief Executive Officer, or Chief Financial Officer, and such person is not replaced with another person acceptable to Lender in its good faith business judgment within 30 days thereafter; or

(q)  Borrower shall generally not pay its debts as they become due, or Borrower shall conceal, remove or transfer any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or

(r)  a Material Adverse Change shall occur.

Borrower shall give Lender immediate written notice of the occurrence of any of the foregoing events.  Lender may cease making any Loans hereunder during any of the above cure periods, and thereafter if an Event of Default has occurred and is continuing.

**7.2  Remedies.**  Upon the occurrence and during the continuance of any Event of Default, Lender, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower), may do any one or more of the following: (a) Cease making Loans or otherwise extending credit to Borrower under this Agreement or any other Loan Document; (b) Accelerate and declare all or any part of the Obligations to be immediately  due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument or agreement evidencing or relating to any Obligation; (c) Take possession of any or

all of the Collateral wherever it may be found, and for that purpose Borrower hereby authorizes Lender without judicial process to enter onto any of Borrower's premises without interference to search for, take possession of, keep, store, or remove any of the Collateral, and remain on the premises or cause a custodian to remain on the premises in exclusive control thereof, without charge for so long as Lender deems it necessary, In its good faith business judgment, in order to complete the enforcement of its rights under this Agreement or any other agreement; provided, however, that should Lender seek to take possession of any of the Collateral by court process, Borrower hereby irrevocably waives: (i) any bond and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession; (ii)  any demand for possession prior to the commencement of any suit or action to recover possession thereof; and (iii) any requirement that Lender retain possession of, and not dispose of, any such Collateral until after trial or final judgment; (d) Require Borrower to assemble any or all of the Collateral and make it available to Lender at places designated by Lender which are reasonably convenient to Lender and Borrower, and to remove the Collateral to such locations as Lender may deem advisable; (e) Complete the processing, manufacturing or repair of any Collateral prior to a disposition thereof and, for such purpose and for the purpose of removal, Lender shall have the right to use Borrower's premises, vehicles, hoists, lifts, cranes, and other Equipment and all other property without charge; (f) Sell, lease or otherwise dispose of any of the Collateral, in its condition at the time Lender obtains possession of it or after further manufacturing, processing or repair, at one or more public and/or private sales, in lots or in bulk, for cash, exchange or other property, or on credit, and to adjourn any such sale from time to time without notice other than oral announcement at the time scheduled for sale.   Lender shall have the right to conduct such disposition on Borrower's premises without charge, for such time or times as Lender deems reasonable, or on Lender's premises, or elsewhere and the Collateral need not be located at the place of disposition. Lender may directly or through any affiliated company purchase or lease any Collateral at any such public disposition, and if permissible under applicable law, at any private disposition.  Any sale or other disposition of Collateral shall not relieve Borrower of any liability Borrower may have if any Collateral is defective as to title or physical condition or otherwise at the time of sale; (g) Demand payment of, and collect any Accounts and General Intangibles comprising Collateral and, in connection therewith, Borrower irrevocably authorizes Lender to endorse or sign Borrower's name on all collections, receipts, instruments and other documents, to take possession of and open mail addressed to Borrower and remove therefrom payments made with respect to any item of the Collateral or proceeds thereof, and, in Lender's good faith business judgment, to grant extensions of time to pay, compromise claims and settle Accounts and the like for

<u>EXHIBIT A</u>

less than face value; and (h) Demand and receive possession of any of Borrower's federal and state income tax returns and the books and records utilized in the preparation thereof or referring thereto. All reasonable attorneys' fees, expenses, costs, liabilities and obligations incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. Without limiting any of Lender's rights and remedies, from and after the occurrence and during the continuance of any Event of Default, the interest rate applicable to the Obligations shall be the lesser of eighteen percent (18.00%) or the Maximum Legal Rate (the "Default Rate").

**7.3    Standards for Determining Commercial Reasonableness.** Borrower and Lender agree that a sale or other disposition (collectively, "sale") of any Collateral which complies with the following standards will conclusively be deemed to be commercially reasonable:  (i) Notice of the sale is given to Borrower at least ten days prior to the sale, and, in the case of a public sale, notice of the sale is published at least five days before the sale in a newspaper of general circulation in the county where the sale is to be conducted; (ii) Notice of the sale describes the collateral in general, non-specific terms; (iii) The sale is conducted at a place designated by Lender, with or without the Collateral being present; (iv) The sale commences at any time between 8:00 a.m. and 6:00 p.m., Central Time; (v) Payment of the purchase price in cash or by cashier's check or wire transfer, or by deferred payment obligation acceptable to Lender in its discretion, is required; (vi) With respect to any sale of any of the Collateral, Lender may (but is not obligated to) direct any prospective purchaser to ascertain directly from Borrower any and all information concerning the same. Lender shall be free to employ other methods of noticing and selling the Collateral, in its discretion, if they are commercially reasonable.

**7.4    Power of Attorney.**  Without limiting Lender's other rights and remedies, Borrower grants to Lender an irrevocable power of attorney coupled with an interest, authorizing and permitting Lender (acting through any of its employees, attorneys or agents) at any time, at its option, but without obligation, with or without notice to Borrower, and at Borrower's expense, to do any or all of the following, in Borrower's name or otherwise:  (a) Execute on behalf of Borrower any documents that Lender may, in its good faith business judgment, deem advisable in order to perfect and maintain Lender's security interest in the Collateral, or in order to exercise a right of Borrower or Lender, or in order to fully consummate all the transactions contemplated under this Agreement, and all other Loan Documents; (b) Execute on behalf of Borrower, any invoices relating to any Account, any draft against any Account Debtor and any notice to any Account Debtor, any proof of claim in bankruptcy, any

Notice of Lien, claim of mechanic's, materialman's or other lien, or assignment or satisfaction of mechanic's, materialman's or other lien; (c) Take control in any manner of any cash or non-cash items of payment or proceeds of Collateral; endorse the name of Borrower upon any instruments, or documents, evidence of payment or Collateral that may come into Lender's possession; (d) Endorse all checks and other forms of remittances received by Lender; (e) Pay, contest or settle any lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (f) Grant extensions of time to pay, compromise claims and settle Accounts and General Intangibles for less than face value and execute all releases and other documents in connection therewith; (g) Pay any sums required on account of Borrower's taxes or to secure the release of any liens therefor, or both; (h) Settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefor; (i) Instruct any third party having custody or control of any books or records belonging to, or relating to, Borrower to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement; and (j) Take any action or pay any sum required of Borrower pursuant to this Agreement and any other Loan Documents. Any and all reasonable sums paid and any and all reasonable costs, expenses, liabilities, obligations and attorneys' fees incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.  In no event shall Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement be deemed to indicate that Lender is in control of the business, management or properties of Borrower.

**7.5    Application of Proceeds.**  All proceeds realized as the result of any sale of the Collateral shall be applied by Lender to the Obligations, in such order as Lender shall determine in its sole discretion.  Any surplus shall be paid to Borrower or other persons legally entitled thereto; Borrower shall remain liable to Lender for any deficiency. If, Lender, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Lender shall have the option, exercisable at any time, in its good faith business judgment, of either reducing the Obligations by the principal amount of purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of the cash therefor.

**7.6    Remedies Cumulative.**  In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded a secured party under the Texas Uniform Commercial Code and under all other applicable laws, and under any other instrument or agreement now or in the future entered into

**EXHIBIT A**

FWC                                                                                  Loan and Security Agreement

between Lender and Borrower, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed.

**8. DEFINITIONS.** As used in this Agreement, the following terms have the following meanings:

"Account Debtor" means the obligor on an Account.

"Accounts" means all present and future "accounts" as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable and other sums owing to Borrower.

"Affiliate" means, with respect to any Person, a relative, partner, shareholder, director, officer, or employee of such Person, or any parent or subsidiary of such Person, or any Person controlling, controlled by or under common control with such Person.

"Borrowing Base Certificate" means each Borrowing Base Certificate in a form acceptable to Lender, to be delivered by the Borrower or appointed Administrative Borrower to Lender, and that is certified to be correct as to all matters therein stated, as amended, supplemented or otherwise modified from time to time.

"Business Day" means a day on which Lender is open for business.

"Capital Expenditures" means all expenditures made and liabilities incurred for the acquisition of any fixed asset or improvement, replacement, substitution or addition thereto which has a useful life of more than one year and including, without limitation, those arising in connection with any lease of property by Borrower that, in accordance with GAAP, should be capitalized for financial reporting purposes and reflected as a liability on the balance sheet of Borrower.

"Code" means the Uniform Commercial Code as adopted and in effect in the State of Texas from time to time.

"Collateral" has the meaning set forth in Section 2 above.

"continuing" and "during the continuance of" when used with reference to a Default or Event of Default means that the Default or Event of Default has occurred and has not been either waived in writing by Lender or cured within any applicable cure period.

"Debt Service" means principal and interest on Indebtedness of Borrower and its Subsidiaries determined on a consolidated basis.

"Default" means any event which with notice or passage of time or both, would constitute an Event of Default.

"Default Rate" has the meaning set forth in Section 7.2 above.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Eligible Accounts" means Accounts arising in the ordinary course of Borrower's business from the sale of material or goods or the rendition of services, which Lender, in its sole and absolute discretion, shall deem eligible for borrowing. Without limiting the fact that the determination of which Accounts are eligible for borrowing is a matter of Lender's discretion, the following (the "Minimum Eligibility Requirements") are the minimum requirements for an Account to be an Eligible Account:

(i) the Account must not be outstanding for more than ninety (90) days from its due date (the "Eligibility Period");

(ii) the payment terms for the Account shall be equal to or less than thirty (30) days from the invoice date;

(iii) the Account must not represent progress billings, or be due under a fulfillment or requirements contract with the Account Debtor, unless Lender receives written acknowledgment from the Account Debtor that the amounts billed by Borrower represent work and/or material furnished and completed as of the date of the subject invoice or payment application. Accounts with respect to projects that require Borrower to obtain either a performance or payment bond shall not be considered Eligible Accounts. Notwithstanding the foregoing, Lender may in its sole discretion deem a bonded Account "Eligible" if the Account Debtor executes a Bond Release Waiver in a form acceptable to Lender in its sole discretion;

(iv) the Account must not be subject to any contingencies (including Accounts arising from sales on consignment, guaranteed sale or other terms pursuant to which payment by the Account Debtor may be conditional);

(v) the Account must not be owing from an Account Debtor with whom Borrower has any material dispute (whether or not relating to the particular Account);

(vi) the Account must not be owing from an Affiliate of Borrower;

<u>EXHIBIT A</u>

FWC                                                                                    Loan and Security Agreement

(vii) the Account must not be owing from an Account Debtor which is subject to any insolvency or bankruptcy proceeding, or whose financial condition is not acceptable to Lender, or which, fails or goes out of a material portion of its business;

(viii) the Account must not be owing from the United States or any department, agency or instrumentality thereof (unless there has been compliance, to Lender's satisfaction, with the United States Assignment of Claims Act);

(ix) the Account must not be owing from an Account Debtor located outside the United States (unless pre-approved by Lender in its discretion in writing, or backed by a letter of credit satisfactory to Lender);

(x) the Account must not be owing from an Account Debtor to whom Borrower is or may be liable for goods purchased from such Account Debtor or otherwise (but, in such case, the Account will be deemed not eligible only to the extent of any amounts owed by Borrower to such Account Debtor);

(xi) the Account must not constitute a retention billing/invoice;

(xii) the Account must not be assigned for collection or designated for such assignment, or an Account for which Lender in its good faith business judgment determines collection to be doubtful;

(xiii) the Account must not be for C.O.D., cash in advance, or similar terms;

(xiv) Accounts owing from one Account Debtor will not be deemed Eligible Accounts to the extent they exceed 25.00% of the total Accounts outstanding; and

(xv) In addition, if more than 25.00% of the Accounts owing from an Account Debtor are outstanding for a period longer than their Eligibility Period (without regard to unapplied credits) or are otherwise not eligible Accounts, then all Accounts owing from that Account Debtor will be deemed ineligible for borrowing.

Lender may, from time to time, in its sole and absolute discretion, revise the Minimum Eligibility Requirements, upon written notice to Borrower.

"Eligible Inventory" means Inventory which Lender, in its sole and absolute discretion, deems eligible for borrowing.    Without limiting the fact that the determination of which Inventory is eligible for borrowing is a matter of Lender's discretion, the following are the minimum requirements for Inventory to be   Eligible Inventory: (i) the Inventory must consist of raw materials and finished goods, in good, new and salable condition, not be perishable, not be obsolete or unmerchantable, and not be comprised of work in process, packaging and shipping materials or supplies; (ii) the Inventory must meet all applicable governmental standards; (iii) the Inventory must have been manufactured in compliance with the Fair Labor Standards Act; (iv) the Inventory must conform in all respects to the warranties and representations set forth in this Agreement; (v) the Inventory must be at all times subject to Lender's duly perfected, first priority security interest; (vi) the Inventory must be situated at Borrower's Address or at one of the domestic locations set forth in the Representations and the Inventory at such locations must exceed $50,000 in value; (vii) the Inventory must not be located on real property leased by Borrower or in a contract warehouse, in each case, (A) unless either (1) it is subject to a landlord agreement or bailee agreement  in  favor  of  Lender executed by the lessor, warehouseman, or other third party, as the case may be, or (2) a Reserve, in an amount satisfactory to (and in the good faith business judgment of) Lender, in respect of the Inventory at such location has been established by Lender,   and (B) unless it is segregated or whom Lender separately identifiable from goods of others (including any Guarantor), if any, stored on the premises; (viii) the Inventory must not be "slow-moving" (including without limitation, for purposes of this clause (viii), any Inventory held in excess of sixty (60) days, provided that lubricant and lubricant-related products, will not be deemed "slow-moving" unless held longer than one-hundred twenty (120) days); (ix) Borrower must have good, valid, and marketable title to such Inventory; (x) the Inventory must not consist of restrictive or custom items, or goods that constitute spare parts, supplies used or consumed in Borrower's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment; and (xi) the Inventory must not consist of Inventory in-transit from one location of Borrower to another location of Borrower.

"Equipment" means all present and future "equipment" as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"Event of Default" means any of the events set forth in Section 7.1 of this Agreement.

"GAAP" means generally accepted accounting principles consistently applied.

"General Intangibles" means all present and future "general intangibles" as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all Intellectual Property, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, claims, income tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including

<u>EXHIBIT A</u>

FWC                                                                                          Loan and Security Agreement

without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"good faith business judgment" means honesty in fact and good faith (as defined in Section 1.201 of the Code) in the exercise of Lender's business judgment.

"Guarantor" means any Person who has guaranteed, or in the future guarantees, any of the Obligations.

"including" means including (but not limited to).

"Indebtedness" means all of Borrower's present and future obligations, liabilities, debts, claims and indebtedness, contingent, fixed or otherwise, however evidenced, created, incurred, acquired, owing or arising, whether under written or oral agreement, operation of law or otherwise to any Person, and includes, without limiting the foregoing (i) the Obligations, (ii) obligations and liabilities of any Person secured by a lien, claim, encumbrance or security interest upon property owned by Borrower, even though Borrower has not assumed or become liable therefor, (iii) obligations and liabilities created or arising under any lease (including capital leases) or conditional sales contract or other title retention agreement with respect to property used or acquired by Borrower, even though the rights and remedies of the lessor, seller or lender are limited to repossession (including, without limitation, the Sale-Leaseback Transaction), (iv) all unfunded pension fund obligations and liabilities and (v) deferred taxes.

"Intellectual Property" means all present and future (a) copyrights, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished, (b) trade secret rights, including all rights to unpatented inventions and know-how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same; (e) trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by any such trademarks; (f) computer software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; and (j) all licenses or other rights to use any property or rights of a type described above.

"Inventory" means all present and future "inventory" as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment" means any beneficial ownership interest in any Person (including stock, securities, partnership interest, limited liability company interest, or other interests), and any loan, advance or capital contribution to any Person, including the creation or capital contribution to an wholly-owned or partially-owned subsidiary)

"Investment Property" means all present and future investment property, securities, stocks, bonds, debentures, debt securities, partnership interests, limited liability company interests, options, security entitlements, securities accounts, commodity contracts, commodity accounts, and all financial assets held in any securities account or otherwise, and all options and warrants to purchase any of the foregoing, wherever located, and all other securities of every kind, whether certificated or uncertificated.

"Loan Documents" means, collectively, this Agreement, any Guaranty, any Subordination Agreement, the Representations, and all other present and future documents, instruments and agreements between Lender and Borrower (or Guarantor, if applicable), including, but not limited to those relating to this Agreement, and all amendments and modifications thereto and replacements therefor.

"Material Adverse Change" means any of the following: (i) a material adverse change in the business, operations, or financial or other condition of the Borrower, or (ii) a material impairment of the prospect of repayment of any portion of the Obligations; or (iii) a material impairment of the value or priority of Lender's security interests in the Collateral.

"Net Income" means, as calculated on a consolidated basis for Borrower and its Subsidiaries for any period as at any date of determination, the net profit (or loss), after provision for taxes, of Borrower and its Subsidiaries for such period taken as a single accounting period.

"Obligations" means all present and future Loans, advances, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any note or other instrument or document, or otherwise, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Borrower's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, expenses, fees, attorney's fees, expert witness fees, audit fees, letter of credit fees, collateral monitoring

<u>EXHIBIT A</u>

FWC                                                              Loan and Security Agreement

fees, closing fees, facility fees, auction fees, liquidation fees, appraisal fees, termination fees, minimum interest charges and any other sums chargeable to Borrower under this Agreement or under any other Loan Documents.

"Other Equipment" is leasehold improvements, intangible property such as computer software and software licenses, equipment specifically designed or manufactured for Borrower, other intangible property, limited use property and other similar property and soft costs approved by Bank, including taxes, shipping, warranty charges, freight discounts and installation expenses.

"Other Property" means the following as defined in the Texas Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and all rights relating thereto: all present and future "commercial tort claims" (including without limitation any commercial tort claims identified in the Representations), "documents", "instruments", "promissory notes", "chattel paper", "letters of credit", "letter-of-credit rights", "fixtures", "farm products" and "money"; and all other goods and personal property of every kind, tangible and intangible, whether or not governed by the Code.

"Payment" means all checks, wire transfers and other items of payment received by Lender (including proceeds of Accounts and payment of the Obligations in full) for credit to Borrower's outstanding Loans.

"Permitted Investments" means:

(i) Investments in Subsidiaries shown on the Representations and existing on the date hereof;

(ii) cash and cash equivalents;

(iii) Investments consisting of Deposit Accounts in which Lender has a first-priority perfected security interest; and

(iv) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

"Permitted Liens" means the following:

(i) security interests in specific items of Equipment listed in the Representations;

(ii) security interests in Equipment where the purchase money lien does not exceed the value of the acquired asset;

(iii) leases of specific items of Equipment listed in the Representations;

(iv) liens for taxes not yet payable;

(v) additional security interests and liens which are subordinate to the security interest of Lender and are consented to in writing by Lender, which consent may be withheld in its good faith business judgment; and

(vi) security interests being terminated substantially concurrently with this Agreement.

Lender will have the right to require, as a condition to its consent under subparagraph (v) above, that the holder of the additional security interest or lien sign an intercreditor agreement on Lender's then standard form, acknowledge that the security interest is subordinate to the security interest in favor of Lender, and agree not to take any action to enforce its subordinate security interest so long as any Obligations remain outstanding, and that Borrower agree that any uncured default in any obligation secured by the subordinate security interest shall also constitute an Event of Default under this Agreement.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, government, or any agency or political division thereof, or any other entity.

"Representations" means the written Representations and Warranties provided by Borrower to Lender referred to in the Schedule.

"Reserves" means, as of any date of determination, such amounts as Lender may from time to time establish and revise in its good faith business judgment, reducing the amount of Loans, and other financial accommodations which would otherwise be available to Borrower under the lending formula(s) provided in the Schedule: (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in its good faith business judgment, do or may adversely affect (i) the Collateral or any other property which is security for the Obligations or its value (including without limitation any increase in delinquencies of Accounts), (ii) the assets, business or prospects of Borrower or any Guarantor, or (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of Borrower or any Guarantor to Lender is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

"Subsidiary" means, with respect to any Person, a Person of which more than 50% of the voting stock or other equity interests is owned or controlled, directly or indirectly, by such Person or one or more Affiliates of such Person.

Other Terms.  All accounting terms used in this Agreement, unless otherwise indicated, shall have the

**EXHIBIT A**

FWC                                                                 Loan and Security Agreement

meanings given to such terms in accordance with GAAP, consistently applied. All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the Code, to the extent such terms are defined therein.

### 9. CROSS-DEFAULT.

9.1 *Cross Default*. This Agreement and each guaranty, pledge agreement and each other agreement, document and instrument executed and/or delivered in connection herewith shall constitute a Loan Document. Any default or event of default or any breach of any representation, warranty, covenant or agreement by Borrower hereunder or under any such other agreement executed and/or delivered in connection herewith shall constitute a Default under this Agreement and the other Loan Documents

### 10. GENERAL PROVISIONS.

10.1 *Computations*. In computing interest on the Obligations, all Payments received after 2:00 Central Time on any day shall be deemed received on the next Business Day, and Payments received by Lender (including proceeds of Receivables and payment of the Obligations in full) shall be deemed applied by Lender on account of the Obligations three (3) Business Days after receipt by Lender of immediately available funds. Lender shall not be required to credit Borrower's account for the amount of any item of payment which is unsatisfactory to Lender in its good faith business judgment, and Lender may charge Borrower's loan account for the amount of any item of payment which is returned to Lender unpaid.

10.2 *Application of Payments*. All payments with respect to the Obligations may be applied, and in Lender's good faith business judgment reversed and re-applied, to the Obligations, in such order and manner as Lender shall determine in its good faith business judgment.

10.3 *Increased Costs and Reduced Return*. If Lender shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or governmental authority, or compliance by Lender with any directive of, or guideline from, any central bank or other Governmental Authority or the introduction of, or change in, any accounting principles applicable to Lender (whether or not having the force of law) shall (i) subject the Lender to any tax, duty or other charge with respect to this Agreement or any Loan made hereunder, or change the basis of taxation of payments to Lender of any amounts payable hereunder (except for taxes on the overall net income of Lender), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan, or against assets of or held by, or deposits with or for the account of, or credit extended by, Lender, or (iii) impose on Lender any other condition regarding this Agreement or any Loan, and the result of any event referred to in

clauses (i), (ii) or (iii) above shall be to increase the cost to Lender of making any Loan, or agreeing to make any Loan or to reduce any amount received or receivable by Lender, then, upon demand by Lender, the Borrower shall pay to Lender such additional amounts as will compensate Lender, or its agents, for such increased costs or reductions in amount. All amounts payable under this Section shall bear interest from the date of demand by the Lender until payment in full to the Lender at the highest interest rate applicable to the Obligations. A certificate of the Lender claiming compensation under this Section, specifying the event herein above described and the nature of such event shall be submitted by the Lender to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and the Lender's reasons for invoking the provisions of this Section, and the same shall be final and conclusive absent manifest error. If Lender exercises this clause, Borrower may terminate the Agreement without incurring the Early Termination fee set forth in section 6.2(b), provided Lender receives sixty (60) days written notice of termination. The foregoing notwithstanding, Lender shall be entitled to all amounts payable under this Section 10.3 through the date of termination and payment of all obligations.

10.4 *Charges to Accounts*. Lender may, in its discretion, require that Borrower pay monetary Obligations in cash to Lender, or charge them to Borrower's Loan account, in which event they will bear interest at the same rate applicable to the Loans.

10.5 *Monthly Accountings*. Lender may provide Borrower monthly with an account of advances, charges, expenses and payments made pursuant to this Agreement. Such account shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless Borrower notifies Lender in writing to the contrary within 60 days after such account is rendered, describing the nature of any alleged errors or omissions.

10.6 *Notices*. All notices to be given under this Agreement shall be in writing and shall be given either personally or by reputable private delivery service or by regular first-class mail, or certified mail return receipt requested, addressed (i) to Borrower at the address shown in the heading to this Agreement, or (ii) to Lender at the address shown in the heading to this Agreement, or (iii) for either party at any other address designated in writing by one party to the other party. All notices shall be deemed to have been given upon delivery in the case of notices personally delivered, or at the expiration of one Business Day following delivery to the private delivery service, or two Business Days following the deposit thereof in the United States mail, with postage prepaid.

10.7 *Severability*. Should any provision of this Agreement be held by any court of competent jurisdiction

EXHIBIT A

FWC                                                                                    Loan and Security Agreement

to be void or unenforceable, such defect shall not affect the remainder of this Agreement, which shall continue in full force and effect.

**10.8   Integration.**   This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith are the final, entire and complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated in this Agreement. There are no oral understandings, representations or agreements between the parties which are not set forth in this Agreement or in other written agreements signed by the parties in connection herewith.

**10.9   Waivers; Indemnity.**   The failure of Lender at any time or times to require Borrower to strictly comply with any of the provisions of this Agreement or any other Loan Document shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith. Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar. None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower. Borrower waives the benefit of all statutes of limitations relating to any of the Obligations or this Agreement or any other Loan Document, and Borrower waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, notice of intent to accelerate, notice of acceleration, release, compromise, settlement, extension or renewal of any commercial paper, instrument, account, General Intangible, document or guaranty at any time held by Lender on which Borrower is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement. Borrower hereby agrees to indemnify Lender and its affiliates, subsidiaries, parent, directors, officers, employees, agents, and attorneys, and to hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every kind, which they may sustain or incur based upon or arising out of any of the Obligations, or any relationship or agreement between Lender and Borrower, or any other matter, relating to Borrower or the Obligations; provided that this indemnity shall not extend to damages proximately caused by the indemnitee's own gross negligence or willful misconduct. Notwithstanding any provision in this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive any termination of this Agreement and shall for all purposes continue in full force and effect.

**10.10   Liability.**   NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS,

EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE LIABLE FOR ANY CLAIMS, DEMANDS, LOSSES OR DAMAGES, OF ANY KIND WHATSOEVER, MADE, CLAIMED, INCURRED OR SUFFERED BY BORROWER OR ANY OTHER PARTY THROUGH THE ORDINARY NEGLIGENCE OF LENDER, OR ITS PARENT OR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS, BUT NOTHING HEREIN SHALL RELIEVE LENDER FROM LIABILITY FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE RESPONSIBLE OR LIABLE TO BORROWER OR TO ANY OTHER PARTY FOR ANY INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, WHICH MAY BE ALLEGED AS A RESULT OF ANY FINANCIAL ACCOMMODATION HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR AS A RESULT OF ANY OTHER ACT, OMISSION OR TRANSACTION.

**10.11   Amendment.**   The terms and provisions of this Agreement may not be waived or amended, except in a writing executed by Borrower and a duly authorized officer of Lender.

**10.12   Time of Essence.**   Time is of the essence in the performance by Borrower of each and every obligation under this Agreement.

**10.13   Attorneys' Fees and Costs.**   Borrower shall reimburse Lender for all reasonable attorneys' fees and all filing, recording, search, title insurance, appraisal, audit, and other reasonable costs incurred by Lender, pursuant to, or in connection with, or relating to this Agreement (whether or not a lawsuit is filed), including, but not limited to, any reasonable attorneys' fees and costs Lender incurs in order to do the following: prepare and negotiate this Agreement and all present and future documents relating to this Agreement; obtain legal advice in connection with this Agreement or Borrower; enforce, or seek to enforce, any of its rights; prosecute actions against, or defend actions by, Account Debtors; commence, intervene in, or defend any action or proceeding; initiate any complaint to be relieved of the automatic stay in bankruptcy; file or prosecute any probate claim, bankruptcy claim, third-party claim, or other claim; examine, audit, copy, and inspect any of the Collateral or any of Borrower's books and records; protect, obtain possession of, lease, dispose of, or otherwise enforce Lender's security interest in, the Collateral; and otherwise represent Lender in any litigation relating to Borrower. If either Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party in such action shall be entitled to recover its reason-

**EXHIBIT A**

able costs and attorneys' fees, including (but not limited to) reasonable attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Lender may be entitled pursuant to this Paragraph shall immediately become part of Borrower's Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.

**10.14  Benefit of Agreement.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; provided, however, that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void. No consent by Lender to any assignment shall release Borrower from its liability for the Obligations.

**10.15  Joint and Several Liability.** If Borrower consists of more than one Person, their liability shall be joint and several, and the compromise of any claim with, or the release of, any Borrower shall not constitute a compromise with, or a release of, any other Borrower.

**10.16  Limitation of Actions.** Any claim or cause of action by Borrower against Lender, its directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Loan Agreement, or any other Loan Document, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Lender, its directors, officers, employees, agents, accountants or attorneys, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one year after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based, and the service of a summons and complaint on an officer of Lender, or on any other person authorized to accept service on behalf of Lender, within thirty (30) days thereafter. Borrower agrees that such one-year period is a reasonable and sufficient time for Borrower to investigate and act upon any such claim or cause of action. The one-year period provided herein shall not be waived, tolled, or extended except by the written consent of Lender in its sole discretion. This provision shall survive any termination of this Loan Agreement or any other Loan Document.

**10.17  Paragraph Headings; Construction.** Paragraph headings are only used in this Agreement for convenience. Borrower and Lender acknowledge that the headings may not describe completely the subject matter of the applicable paragraph, and the headings shall not be used in any manner to construe, limit, define or interpret any term or provision of this Agreement. This Agreement has been fully reviewed and negotiated between the parties and no

uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

**10.18  Public Announcement.** Borrower hereby agrees that Lender may make a public announcement of the transactions contemplated by this Agreement, and may publicize the same in marketing materials, newspapers and other publications, and otherwise, and in connection therewith may use the Borrower's name, tradenames and logos.

**10.19  Governing Law; Jurisdiction; Venue.** This Agreement and all acts, transactions, disputes and controversies arising hereunder or relating hereto, and all rights and obligations of the parties shall be governed by, and construed in accordance with, the internal laws (and not the conflict of laws rules) of the State of Texas. Each party consents to the jurisdiction of courts or tribunals located within Travis County, Texas , and agrees that the exclusive venue for all actions and proceedings (including any alternative dispute resolution method as described in Section 10.20 of this Agreement) relating directly or indirectly to this Agreement shall be Travis County, Texas, provided that nothing herein shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction. Any judicial proceeding by Borrower against Lender or any affiliate thereof involving, directly or indirectly, any matter in any way arising out of, related to, or connected with any Loan Document shall be brought only in a proceeding in Travis County, Texas, and shall be subject to the provisions of Sections 10.20 and 10.21 below. Each party waives any and all rights the party may have to object to the jurisdiction of any such tribunal or court, or to transfer or change the venue of any such action or proceeding from such tribunal or court, including, without limitation, any objection to venue or request for change in venue based on the doctrine of *forum non conveniens.* Borrower consents to service of process in any action or proceeding brought against it by Lender, by personal delivery, or by mail addressed as set forth in this Agreement or by any other method permitted by law.

**10.20  Dispute Resolution.** (a) **Mediation.** In the event of a dispute between the parties concerning any aspect of this Loan Agreement and except for any matters pertaining to Borrower's commission of an Event of Default under paragraph 7 hereof ("Alternative Dispute Exceptions"), the parties shall first meet within two (2) business days of receipt of any request and, in good faith, seek to resolve the dispute before such party may commence any action, whether arbitration or litigation. If the parties fail to reach an agreement in the mediation process within five (5) days, then either party may, if it so chooses, commence arbitration or litigation, as this Agreement may allow. Borrower and Lender reserve all of their respective rights in the event that no agreed resolution is reached in the mediation procedure and

<u>EXHIBIT A</u>

FWC                                                                              Loan and Security Agreement

neither party shall be deemed to be precluded from commencing an action for the sole purpose of preventing irreparable harm while the mediation procedure is pending or continuing.

(b) **Arbitration.** Except for the Alternative Dispute Exceptions, any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this provision to arbitrate, shall be governed by the Texas General Arbitration Act, V.T.C.A., Civil Practices and Remedies Code, § 171.001 *et seq.* or, if interstate commerce is involved and to the extent provided, the Federal Arbitration Act. Arbitration shall be determined before one arbitrator. At the option of the first to commence an arbitration, the arbitration shall be administered either by JAMS pursuant to its Streamlined Arbitration Rules and Procedures, or by the American Arbitration Association pursuant to its Commercial Arbitration Rules. Judgment on the award may be entered in any court having jurisdiction. In addition to the Alternative Dispute Exceptions, this clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) **Temporary Relief.** Without prejudice to any party or this arbitration provision, any of the parties may petition an appropriate court of competent jurisdiction for any temporary or preliminary relief, such as for an injunction or garnishment. The filing for such relief shall not be considered a waiver of the right to arbitration under this provision. Alternatively, pending arbitration, any provisional remedy which would be available from a court of law shall be available to the parties to this Agreement from the arbitrators.

*10.21 Mutual Waiver of Jury Trial.* BORROWER AND LENDER EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO, THIS AGREEMENT OR ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND BORROWER, OR ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN ALL OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

BORROWER:

ROADMARK CORPORATION,
a North Carolina corporation

By: *Patrick A Conway*
    Patrick A Conway (Jul 7, 2014)
Patrick Aloysius Conway, President

LENDER:

DSCH CAPITAL PARTNERS, LLC,
d/b/a FAR WEST CAPITAL,
a Texas limited liability company

By *Brian Center*
   Brian Center (Jul 8, 2014)
   Brian Center, President & CCO

<u>EXHIBIT A</u>

**Schedule to**

**Loan and Security Agreement**

Borrower:

**Roadmark Corporation,**
**a North Carolina corporation**
**900 E. C Street**
**Butner, NC 27509**

Date:        Jul 7, 2014        (the "**Effective Date**")

This Schedule forms an integral part of the Loan and Security Agreement between DSCH Capital Partners, LLC, d/b/a Far West Capital and the above-borrower of even date (as amended, restated, supplemented, or otherwise modified from time to time, this "Agreement" or the "Loan Agreement").

---

**1. CREDIT LIMIT**
(Section 1.1):        "Credit Limit" shall mean the sum of (A) and (B) below, and shall at no time exceed the amount of $5,000,000.00 ("Maximum Revolver Amount"):

As used herein, the term "Loans" means, individually and collectively, the Revolving Loans under Part A and Part B below.

A.   AR Revolving Loans.   Subject to the terms and conditions of this Agreement, and at Lender's sole and absolute discretion, Lender shall make revolving advances ("AR Revolving Loans") in an aggregate outstanding amount not to exceed at any time the AR Borrowing Base (as defined below), *provided* that at no time shall the combined balance of the AR Revolving Loans and Inventory Revolving Loans (as defined below) exceed the amount of $5,000,000.00.

As used herein, the term "AR Borrowing Base" means 80.00% (the "AR Advance Rate") of Borrower's Eligible Accounts (as defined in Section 8 above and as determined by Lender in its sole and absolute discretion). Lender may, from time to time, modify the AR Advance Rate and/or the Credit Limit, in its good faith business judgment, upon notice to the Borrower, based on changes in collection experience with respect to Accounts, its evaluation of the Inventory, or other issues or factors relating to the Accounts, Inventory or other Collateral or Borrower.

B.   Inventory Revolving Loans.   Subject to the terms and conditions of this Agreement, and at Lender's sole and absolute discretion, Lender shall make revolving advances ("Inventory Revolving Loans") in an aggregate outstanding amount not to exceed at any time the Inventory Borrowing Base (as defined below), *provided* that at no time shall the combined AR Revolving Loans and Inventory Revolving Loans exceed the amount of $5,000,000.00.

As used herein, the term "Inventory Borrowing Base" means 40.00% (the "Inventory Advance Rate") of Borrower's Eligible Inventory (as defined in Section 8 above), calculated at cost and as determined by Lender in its sole discretion. Lender may, from time to time, modify the Inventory Advance Rate and/or the Credit Limit, in its good faith business judgment, upon notice to the Borrower, based on changes in collection experience with respect to Accounts, its evaluation of the Inventory, or other issues or factors relating to the Accounts, Inventory or other Collateral or Borrower.

1

**EXHIBIT A**

## 2. INTEREST.

### Interest Rate (Section 1.2):

The Obligations outstanding from time to time shall bear interest at an annual rate equal to the "Prime Rate" in effect from time to time, plus 4.25% per annum.

Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.

As used in this Agreement, "Prime Rate" means the "prime rate" published from time to time in the *Wall Street Journal*. The interest rate applicable to the Obligations shall change on each date there is an applicable change in the Prime Rate. Interest is also subject to the operation, as applicable, of Section 7.2 of the Loan Agreement as to the Default Rate.

## 2A. USURY SAVINGS CLAUSE

Provisions Relating to Interest

Notwithstanding the provisions of this Agreement regarding the rates of interest applicable to the Loans, if at any time the amount of such interest computed on the basis of the interest rate set forth herein (the "Applicable Interest Rate") would exceed the amount of such interest computed upon the basis of the maximum rate of interest permitted by applicable state or federal law in effect from time to time hereafter, after taking into account, to the extent required by applicable law, any and all fees, payments, charges and calculations provided for in this Agreement or in any other agreement between Borrower and Lender (the "Maximum Legal Rate"), the interest payable under this Agreement shall be computed upon the basis of the Maximum Legal Rate, but any subsequent reduction in the Applicable Interest Rate shall not reduce such interest thereafter payable hereunder below the amount computed on the basis of the Maximum Legal Rate until the aggregate amount of such interest accrued and payable under this Agreement equals the total amount of interest which would have accrued if such interest had been at all times computed solely on the basis of the Applicable Interest Rate.

No agreements, conditions, provisions or stipulations contained in this Agreement or any other instrument, document or agreement between the Borrower and Lender or default of the Borrower, or the exercise by Lender of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever contained in this Agreement or any other agreement between the Borrower and Lender, or the arising of any contingency whatsoever, shall entitle Lender to collect, in any event, interest exceeding the Maximum Legal Rate and in no event shall the Borrower be obligated to pay interest exceeding such Maximum Legal Rate and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel the Borrower to pay a rate of interest exceeding the Maximum Legal Rate, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest over such Maximum Legal Rate. In the event any interest is charged in excess of the Maximum Legal Rate ("Excess"), the Borrower acknowledges and stipulates that any such charge shall be the result of an accidental and bona fide error, and such Excess shall be, first, applied to reduce the principal then unpaid hereunder; second, applied to reduce the remaining Obligations; and third, returned to the Borrower, it being the intention of the parties hereto not to enter at any time into a usurious or otherwise illegal relationship. The Borrower recognizes that, with fluctuations in the

**<u>EXHIBIT A</u>**

Applicable Interest Rate and the Maximum Legal Rate, such an unintentional result could inadvertently occur. By the execution of this Agreement, the Borrower covenants that (i) the credit or return of any Excess shall constitute the acceptance by the Borrower of such Excess, and (ii) the Borrower shall not seek or pursue any other remedy, legal or equitable, against Lender, based in whole or in part upon the charging or receiving of any interest in excess of the maximum authorized by applicable law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Lender, all interest at any time contracted for, charged or received by Lender in connection with this Agreement shall be amortized, prorated, allocated and spread in equal parts during the entire term of this Agreement.

The provisions of this Section 2A of this Schedule shall be deemed to be incorporated into every document or communication relating to the Obligations which sets forth or prescribes any account, right or claim or alleged account, right or claim of Lender with respect to the Borrower (or any other obligor in respect of Obligations), whether or not any provision of this Section 2A of this Schedule is referred to therein. All such documents and communications and all figures set forth therein shall, for the sole purpose of computing the extent of the liabilities and obligations of the Borrower (or other obligor) asserted by Lender thereunder, be automatically recomputed by any Borrower or obligor, and by any court considering the same, to give effect to the adjustments or credits required by this Section 2A of this Schedule.

If the applicable state or federal law is amended in the future to allow a greater rate of interest to be charged under this Agreement or any other Loan Documents than is presently allowed by applicable state or federal law, then the limitation of interest under this Section 2A of this Schedule shall be increased to the maximum rate of interest allowed by applicable state or federal law as amended, which increase shall be effective hereunder on the effective date of such amendment, and all interest charges owing to Lender by reason thereof shall be payable upon demand.

| 3. FEES (Section 1.4): | The following fees and charges shall be paid by Borrower as set forth in this Section 3. |
|---|---|
| Loan Fee: | $50,000.00, fully earned as of the date hereof and payable concurrently herewith. |
| Anniversary Fees: | Borrower shall pay Lender an Anniversary Fee of $50,000.00 , payable with or without notice or demand on each anniversary of the Effective Date. |
| Collateral Monitoring Fee: | AR Monitoring Fee: A monthly fee (the "AR Monitoring Fee") equal to 0.85% of the average of Gross Eligible Accounts, payable each month in arrears on the last day of each month (prorated for any partial month at the beginning and at termination of this Agreement). |
| | Inventory Monitoring Fee. A monthly fee equal to 0.65% of Gross Eligible Inventory calculated at cost, accruing daily and payable each month in arrears on the last day of each month (prorated for any partial month at the beginning and at termination of this Agreement). |
| Misdirected Payment Fee. | Borrower shall pay a Misdirected Payment Fee of fifteen percent (15.00%) of the amount of any payment on any Account, which is received by Borrower and not delivered in kind to Lender within 3 business days following the date of receipt by Borrower. This fee shall be due upon demand by Lender. |

<u>EXHIBIT A</u>

| Missing Notation Fee. | Borrower shall pay a Missing Notation Fee of fifteen percent (15.00%) of the Account on any invoice delivered to an Account Debtor that does not contain the required notice set forth in Section 4.4 of the Agreement. |
| Additional Fees. | Borrower shall pay any other fees and charges identified in (and shall comply with) Lender's "Client Reference Manual," which contains Lender's manual of policies, procedures, rules, and regulations, as such may exist presently, and as may be revised and/or amended from time to time at the Lender's discretion, upon notice to Borrower. |

## 4. MATURITY DATE
### (Section 6.1):

As used herein, the term "Maturity Date" means the second anniversary of the Effective Date, and thereafter, the Maturity Date shall automatically be extended for successive periods of one year each, unless Borrower shall give Lender written notice of termination not less than ninety (90) days prior to the end of such term or renewal term, as applicable. Notwithstanding anything herein to the contrary, Lender may terminate the Agreement at any time by giving Borrower ninety (90) days prior written notice; provided that, upon an Event of Default, Lender may terminate this Agreement without notice to Borrower, effective immediately.

## 5. FINANCIAL COVENANTS
### (Section 5.1):

Borrower shall comply with the following covenant.    Compliance shall be determined as of the end of each fiscal quarter, except as otherwise specifically provided below:

**Amortization of Inventory Line**   The maximum credit line for the Inventory Revolving Loan as of the Effective Date is $500,000.00.  Lender shall reduce the 40% Inventory Advance Rate by 5% in August, 2014, and 5% in September 2014, and will further reduce the advance rate by 7.5% each subsequent month thereafter until the Inventory Revolving Loan balance is paid in full.

## 6. REPORTING.
### (Section 5.3):

Borrower shall provide Lender with the following:

(a)    Borrowing Base Certificates and transaction reports, schedules of collections, schedules of inventory in a format acceptable to Lender, sales journal, credit memos, and summary accounts receivable agings aged by due date, each week and at the time of each Loan request, on Lender's standard form.

(b)    Monthly detailed accounts receivable agings, aged by invoice date, within ten days after the end of each month.

(c)    Monthly accounts payable agings, aged by invoice date, and outstanding or held check registers, if any, within ten days after the end of each month.

(d)    Monthly reconciliations of accounts receivable agings (aged by invoice date), transaction reports, and general ledger, within ten days after the end of each month.

(e)    Monthly inventory reports for the Inventory reconciled to the general ledger and valued on a first-in, first-out basis at the lower of cost or market (in accordance with GAAP) or such other inventory reports as are requested by

<u>EXHIBIT A</u>

Lender in its good faith business judgment, all within ten days after the end of each month.

(f) Monthly reports setting forth all delinquent Accounts and charge-offs, as soon as available, and in any event within ten days after the end of each month.

(g) Monthly unaudited financial statements, as soon as available, and in any event within 30 days after the end of each month.

(h) Annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower no later than 60 days prior to the end of each fiscal year of Borrower.

(i) Annual financial statements, as soon as available, and in any event within 120 days following the end of Borrower's fiscal year, reviewed by independent certified public accountants acceptable to Lender.

(j) Each of the financial statements in subsections (g) and (i) above shall be accompanied by Compliance Certificates, in such form as Lender shall reasonably specify, signed by the Chief Financial Officer of Borrower, certifying that as of the end of such period Borrower was in full compliance with all of the terms and conditions of this Agreement, if applicable, and setting forth calculations showing compliance with the financial covenants set forth in this Agreement and such other information as Lender shall request in its good faith business judgment, including, without limitation, a statement that at the end of such period there were no held checks.

(k) Borrower's annual tax return within ten days after the date filed, but in no event later than nine months after Borrower's fiscal year-end.

(l) Evidence in form acceptable to Lender of payments of all foreign, federal, state and local taxes, assessments, deposits and contributions now or in the future owed by Borrower, monthly or as more often required by Lender.

## 7. BORROWER INFORMATION:

Borrower represents and warrants that the information set forth in the Representations and Warranties of the Borrower dated May 15, 2014, previously submitted to Lender (the "Representations") is true and correct as of the date hereof.

## 8. ADDITIONAL PROVISIONS

(a) **Subordination of Inside Debt.** All present and future indebtedness of Borrower to its officers, directors, shareholders and Affiliates (collectively, "Inside Debt") shall, at all times, be subordinated to the Obligations pursuant to a subordination agreement on Lender's standard form. Borrower represents and warrants that there is no Inside Debt presently outstanding, except for the following:

| Indebtedness to: | Principal Amount |
| --- | --- |
| none | |
| | |
| | |

<div align="right">

## EXHIBIT A

</div>

Concurrently Borrower shall cause the above Persons to execute and deliver to Lender a subordination agreement with respect to the foregoing debt on Lender's standard form. Prior to incurring any Inside Debt in the future, Borrower shall cause the person to whom such Inside Debt will be owed to execute and deliver to Lender a subordination agreement on Lender's standard form.

(b)    **Copyrights, Patents, and Trademarks.**

(i) Borrower hereby represents and warrants that, as of the date of this Agreement, Borrower does not have any maskworks, computer software, or other copyrights, that are registered (or are the subject of any application for registration) with the United States Copyright Office. Borrower hereby covenants and agrees that Borrower will *NOT* register with the United States Copyright Office (or apply for such registration of) any of Borrower's maskworks, computer software, or other copyrights, unless Borrower has provided Lender not less than 30 days prior written notice of the commencement of such registration/application and Borrower has executed and delivered to Lender such security agreement(s) and other documentation (in form and substance reasonably satisfactory to Lender) which Lender in its good faith business judgment may require for filing with the United States Copyright Office with respect to such registration or application.

(ii) Borrower will identify to Lender in writing any and all patents and trademarks of Borrower that are registered (or the subject of any application for registration) with the United States Patent and Trademark Office and, upon Lender's request therefor, promptly execute and deliver to Lender such security agreement(s) and other documentation (in form and substance reasonably satisfactory to Lender) which Lender in its good faith business judgment may require for filing with the United States Patent and Trademark Office with respect to such registration or application.

(iii) Borrower will: (x) protect, defend and maintain the validity and enforceability of Borrower's copyrights, patents, and trademarks; (y) promptly advise Lender in writing of material infringements of Borrower's copyrights, patents, or trademarks of which Borrower is or becomes aware; and (z) not allow any material item of Borrower's copyrights, patents, or trademarks to be abandoned, forfeited or dedicated to the public without Lender's written consent.

(c)    **Bailee Agreement.** Borrower hereby represents and warrants that, as of the date of execution and delivery of this Agreement, no goods of Borrower are in the possession of any warehouseman or other bailee (except as set forth in Section 3(d) of the Representations), and hereby covenants that Borrower promptly shall deliver written notice to Lender of any goods of Borrower being in the possession of any other warehouseman or other bailee. With respect to any goods or other Collateral of Borrower in the possession of any warehouseman or other bailee (including any set forth in Section 3(d) of the Representations), Borrower shall, promptly upon Lender's request therefor, use commercially reasonable efforts to deliver to Lender a bailee agreement (in form and substance satisfactory to Lender) duly executed by such warehouseman or other bailee. In the event that Lender requests such a bailee agreement and Borrower uses such efforts but does not succeed in delivering such a bailee agreement, Lender may (in its good faith business judgment) maintain a Reserve with respect to such warehouse or other

<u>EXHIBIT A</u>

bailee location. Additionally, Lender will establish a Reserve equal to three (3) months' worth of warehouse fees that are charged to Borrower.

(d)    **Landlord Agreement.** With respect to any leased premises of Borrower, Borrower shall, promptly upon Lender's request therefor, deliver to Lender a landlord agreement (in form and substance satisfactory to Lender) duly executed by the lessor of such leased premises. Without limiting the generality of the foregoing, Lender has requested that Borrower deliver, on or before the date of this Agreement, such a landlord agreement duly executed by the applicable landlord with respect to Borrower's Address, and Lender may (in its good faith business judgment) maintain a Reserve with respect to Borrower's Address location in the event Lender does not receive such landlord agreement.

(e)    **Control Agreements.** As to any Deposit Accounts (including any lockbox or blocked account) and Investment Property (including securities accounts) maintained with any institution as of the date of this Agreement, Borrower shall cause such institution, concurrently herewith, to enter into a control agreement in form acceptable to Lender in its good faith business judgment in order to perfect Lender's first-priority security interest in such Deposit Accounts (including any lockbox or blocked account) and grant Lender "control" (within the meaning of Articles 8 and 9 of the Code) over such Investment Property (including securities accounts). From and after the date of this Agreement, Borrower shall not maintain any Deposit Accounts (including any lockbox or blocked account) or Investment Property (including securities accounts) with any bank, securities intermediary, or other institution unless Lender has received such a control agreement duly executed by such party in favor of Lender covering such Deposit Account (including any lockbox or blocked account) or Investment Property (including securities accounts), as the case may be.

## 9. CONDITIONS PRECEDENT

In addition to the other conditions precedent set forth in this Agreement, the making of the initial Loan hereunder is subject to the following additional conditions:

(a)    **Searches; Payoff Letter; UCC Terminations.** Lender shall have received lien searches listing all effective financing statements which name Borrower (or any predecessor entity, prior name, or tradename thereof or any seller of assets acquired by Borrower outside of the ordinary course of business) as debtor that are filed in the applicable filing offices with respect to Borrower, none of which financing statements shall cover any of the Collateral of Borrower, except (1) Lender's own financing statements and fixture filings (as the case may be) filed of record against Borrower, respectively, (2) financing statements perfecting Permitted Liens, (3) financing statements as to which Lender has received duly executed authorization by the applicable secured party to file executed termination statements or partial release statements in form and substance satisfactory to Lender, or (4) as otherwise agreed in writing by Lender.

(b)    **Lockbox.** Lender shall have received the lockbox agreement or blocked account agreement (as the case may be) required under Section 4.4 of this Agreement, and the lockbox arrangements or blocked account arrangements (as the case may be) thereunder shall be in full force and effect.

**EXHIBIT A**

# SCHOBER & SCHOBER, PC

400 W. 15th Street, Suite 404
Austin, Texas 78701

512.474.7678 (main)
512.498.1333 (facsimile)
www.schoberlegal.com

Jim Schober
512.791.1499 (direct/mobile)
jim@schoberlegal.com

February 11, 2015

*Via e-mail (jan@nbfirm.com)*
*and facsimile (919) 942-6603*
John A. Northen, Esq.
Northern Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208

Re:    *In re Roadmark Corp.*, Case No. 15-00432-5-DMW, in the United States
       Bankruptcy Court for the Eastern District of North Carolina (Raleigh Division)

Dear John:

As you know, this office represents DSCH Capital Partners, LLC d/b/a Far West Capital ("Far
West"), a secured creditor in the above-referenced chapter 11 bankruptcy case. The purpose of
this letter is to formally demand an explanation as to certain troubling discrepancies in the
debtor's financial reporting within the last thirty days. Far West representatives have been
attempting to reach your client for several days to discuss these issues informally, but their
requests for information are not being met.

Enclosed herewith you will find certain financial information that was submitted to Far West by
Roadmark Corporation shortly before the petition date. The enclosed documents include an
accounts receivable aging report and a retainage report, each dated as of January 13, 2015, and
indicate that Roadmark held the following assets as of that date:

| **Jan. 13** | Bonded A/R: | $ 2,132,247 |
|---|---|---|
| | Non-bonded A/R: | $ 2,581,586 |
| | Retainage: | $    331,138 |
| | **Total:** | **$ 5,044,971** |

<u>EXHIBIT B</u>

John A. Northern, Esq.
February 11, 2015
Page 2

On January 26, 2015, less than two weeks after submitting the above-described asset reports, Roadmark filed for chapter 11 protection. On February 6, 2015, the debtor provided its first set of postpetition financial reports pursuant to Court's *Interim Order Granting Motion for Authority to Use Cash Collateral* (the "Interim Cash Collateral Order"). Based on these reports, the debtor's total receivables had dropped to $4,655,082 as of the end of January[1]:

| | |
|---|---|
| Bonded A/R: | $ 2,225,963 |
| Non-bonded A/R: | $ 2,115,967 |
| Retainage: | $ 313,152 |
| **Total:** | **$ 4,655,082** |

A simple comparison of the January 13 report and the February 5 report shows that Roadmark's accounts receivable have dropped by nearly $389,889 during that three-week period, and the non-bonded receivables (upon which Far West most relies) have dropped by even more. This precipitous loss of value, however, is not even the most troubling aspect of the debtor's financial reports. The most troubling aspect is that the loss of value is completely unaccounted for.

Prior to the petition date, Far West had the exclusive right to collect Roadmark's accounts receivable pursuant to the parties' *Loan and Security Agreement* dated July 7, 2014 (the "LSA").[2] Between January 13 and the January 26 petition date, Far West collected only $40,641.00 in account proceeds. According to the debtor's reports, its postpetition collections for the last week of January were only $53,444.00. Based on these two numbers, Roadmark's total accounts receivable should not have dropped by more than $94,085 between January 13 and January 31, even if Roadmark did not generate a single dollar in new receivables during that period. In fact, however, the debtor claims to have generated at least $249,209 in receivables during that period, suggesting that the debtor's total accounts should have actually *increased* by at least $155,124.

Based on the foregoing, it would appear that during the last three weeks of January, at least $545,013 in collateral value vanished without explanation. This number is calculated as the difference between Roadmark's self-reported total receivables on January 13 ($5,044,971), minus the debtor's self-reported total receivables on January 31 ($4,655,082), plus the debtor's self-reported new receivables generated during the same period ($249,209), minus all known collections by Far West during that period ($40,641), and minus all known collections by the debtor during that period ($53,444).

---

[1] The debtor's "Budget Variance Report" purports to show the debtor's actual results through the end of the last week in January (i.e., the week ending January 31, the first week of the bankruptcy case). The accounts receivable aging report that accompanies the Budget Variance Report is dated as of February 5, 2015. Despite the five-day difference in effective dates, however, both reports show approximately $4,655,082 in total accounts receivable.

[2] Sections 4.4 and 4.5 of the LSA provide, among other things, that all of Roadmark's accounts receivable shall be collected through a lockbox maintained by Far West, and that any proceeds on the receivables that are received by Roadmark shall be segregated from Roadmark's other assets and held in an express trust for the benefit of Far West.

**EXHIBIT B**

John A. Northern, Esq.
February 11, 2015
Page 3

On behalf of Far West, we hereby request that you provide a complete written explanation, no later than the close of business on Friday, for the discrepancies outlined and detailed in this letter.   Absent a full and satisfactory written explanation, Far West will be forced to seek emergency relief in the bankruptcy court.   Meanwhile, if you have any questions regarding this letter or the documents enclosed herewith, please do not hesitate to call at any time.

Sincerely,

Jim Schober

JMS/clm
Enclosure

cc:     Teresa Schober, Esq.
        Jeb Jeutter, Esq.
        Brian C. Behr, Esq.
        Mr. Brian Center

**EXHIBIT B**



Customer Name: Roadmark Corporation

Date: 01/13/16

Certificate # 39

| | | Combined | AR | Inventory |
|---|---|---|---|---|
| 1) Beginning Accounts Receivable Balance | *(per line 6 of prior certificate)* | | $ 5,312,622.82 | |
| **2) Add:** | | | | |
| a) Sales dated: | | | $ 10,710.00 | |
| b) Adjustments | | | $ - | |
| c) Net Additions | | | $ 10,710.00 | |
| **3) Deduct:** | | | | |
| a) Gross A/R Deductions dated: | *(from line 3 of Remittance Report)* | | $ 257,362.39 | |
| b) Credit Memos | | | $ 20,998.42 | |
| c) Adjustments | *(line 4c of Remittance Report)* | | $ - | |
| d) Net Deductions | | | $ 278,360.81 | |
| 4) Roll-forward Accounts Receivable Balance | *(line 1, plus line 2c, minus line 3d)* | | $ 5,044,972.01 | |
| 5) Other Adjustments: increase / (decrease) | | $ - | | |
| 6) Net Collateral Balance | *(line 4 plus or minus line 5)* | $ 7,715,756.18 | $ 5,044,972.01 | $ 2,670,784.17 |
| 7) Ineligible Collateral Per Recapitulation Dated: | | $ 3,845,137.65 | $ 3,248,181.35 | $ 396,956.30 |
| 8) Eligible Collateral | *(line 6 minus line 7)* | $ 4,070,618.53 | $ 1,796,790.66 | $ 2,273,827.87 |
| 9) Advance Rates | | | 80% | 23% |
| 10) Total Availability | *(Line 12 Period Ending Recap)* | $ 1,937,432.63 | $ 1,437,432.63 | 500,000.00 |
| 11) Other Availability | | $ - | $ - | $ - |
| 12) Hold-backs | 0 | $ - | $0.00 | $ - |
| 13) Gross Eligible | *(total lines 10 through 12)* | $ 1,937,432.63 | $ 1,437,432.63 | $ 500,000.00 |
| 14) Line Cap | | $ 7,000,000.00 | $ 7,000,000.00 | $ 7,000,000.00 |
| 15) Net Available | *(lesser of line 13 or 14)* | $ 1,937,432.63 | $ 1,437,432.53 | $ 500,000.00 |
| | | | AR | Inventory |
| 16) Beginning NFE Balance | *(from line 22 of prior certificate)* | $ 2,074,584.37 | $ 1,574,584.37 | 500,000.00 |
| 17) Deduct: Cash Remitted | *(per line 7 of Remittance Report)* | $ 269,173.04 | $269,173.04 | |
| 18) NFE Adjustments: increase/(decrease) | | | $ 51,225.78 | |
| 19) Adjusted NFE Balance | | $ 1,856,637.11 | $ 1,356,637.11 | $ 500,000.00 |
| 20) Transfer (to)/from Inventory | | $ - | | |
| 21) Add: Advance Requested | *(if cell is yellow, advance does not equal Recap Report)* | $ - | | |
| 22) Final NFE Balance | | $ 1,856,637.11 | $ 1,356,637.11 | $ 500,000.00 |
| 23) Final Excess Reserves | | $ 80,795.42 | $ 80,795.42 | $ - |

*This Certificate and supporting data (collectively the "Certificate" is delivered in accordance with the Loan and Security Agreement ("Agreements") dated as of July 9, 2014 between Far West Capital ("Lender") and Roadmark Corporation ("Borrower"). Borrower represents and warrants to Lender that this Certificate is true, correct, and based upon information contained in Seller's financial and accounting records. By executing this Certificate, Borrower hereby ratifies, confirms, and affirms all of the terms, conditions, and provisions of the Agreements and further certifies on this day that NO DEFAULT or EVENT OF DEFAULT has occurred and is continuing and Seller is otherwise in compliance with the Agreements.*

By: _____   Dated: January 7, 2016
     *Authorized Signature*

EXHIBIT B

# Remittance Report



| | | |
|---|---|---|
| Customer Name: | Roadmark Corporation | Date: 01/13/15 |

Borrowing Base #    39

1) Cash Receipts at Company    $    -

2) Cash Receipts Per Lock-Box    $    257,362.39

3) Total A/R Cash    *(#1 plus #2)*    $257,362.39

4) Non-Cash A/R Reductions:
   a) Discounts    $    -
   b) Other (Detail Below)    $    -
   c) Total Reductions    $    -

5) Total Receivable Reductions    *(line #3 plus #4C)*    $257,362.39

6) Other, Non Accounts Receivable Cash Applied    $    11,810.65

7) Total Cash Applied    *(lines 3 plus 6)*    $269,173.04

*To the best of the undersigned's knowledge, the above information is true, accurate and complete.*

By: _____    Dated: _____
   *Authorized Signature*

<u>EXHIBIT B</u>

# Period End Recap Report



**Customer Name:** Roadmark Corporation
**Period Ending:** 1/3/2015

**Accounts Receivable**

1) Total Accounts Receivable per attached aging for the period ending:

| Current | 31 - 60 | 61 - 90 | Over 90 | | Total |
|---|---|---|---|---|---|
| $ 1,398,198.99 | $ 704,241.12 | $ 875,049.58 | $ 2,067,482.32 | $ | 5,044,972.01 |

2) Less:

| | | | |
|---|---|---|---|
| Past due ineligibles over 90 days past due | | $ | 2,067,482.32 |
| Other Ineligibles: | Concentrations (25%) | $ | |
| Other Ineligibles: | Aged Credits, over 90 days | $ | |
| Other Ineligibles: | Cross-Aged (25%) | $ | 119,760.41 |
| Other Ineligibles: | Intercompany / Employees / Individuals | $ | |
| Other Ineligibles: | Contra Accounts | $ | |
| Other Ineligibles: | Foreign (uninsured) & Government | $ | |
| Other Ineligibles: | Pre-billed / unshipped | $ | |
| Other Ineligibles: | Potential Roll (7 days) | $ | |
| Other Ineligibles: | Retainage | $ | |
| Other Ineligibles: | Other | $ | 1,060,938.62 |

| | | | |
|---|---|---|---|
| 3) Total Ineligible Accounts | | $ | 3,248,181.35 |
| 4) Eligible Accounts Receivable | *(line 1 minus line 3)* | $ | 1,796,790.66 |
| 5) Accounts Receivable Advance Rate | 80% | $ | 1,437,432.53 |
| 6) Accounts Receivable Availability | *Line Cap Amount* $ 7,000,000.00 | $ | 1,437,432.53 |

**Inventory**    *As of:*

| Inventory | Amount | Ineligible | Eligible | Advance Rate | Availability |
|---|---|---|---|---|---|
| 7) RM | $ 2,670,784.17 | $ 396,956.30 | $ 2,273,827.87 | 23% | $ 511,611.27 |
| FG | | | | 50% | $ - |
| Total Eligible Inventory | | | *Line Cap Amount* $ 500,000.00 | | 511,611.27 |

8) Total Inventory Availability   *(the lesser of total eligible inventory, line cap, and % AR NFE - date sensitive)*   $   500,000.00

| Ineligibles: | RM | FG |
|---|---|---|
| Slow Moving | $ | $ |
| Obsolete | $ | $ |
| Off-site Inventory | $ 2,396,530.91 | $ |
| Other / Returns | $ | $ |

| | | | |
|---|---|---|---|
| 9) Other Availability AR (Describe): | | $ | |
| 10) Other Availability INV (Describe): | | $ | |
| 11) Holdbacks (explain): | | $ | |
| 12) Total Gross Availability | *(The lesser of the total of lines 6, 8, 9, and 10 or Credit limit)* Line Limit $7,000,000.00 | $ | 1,937,432.53 |
| 13) End of Period NFE Balance | | $ | 1,856,637.11 |
| 14) Net Excess Reserves | *(line 11 less line 12)* | | $80,795.42 |
| 15) Advance Request | | $ | |
| 16) Availability | | $ | 80,795.42 |

All Withholding Taxes and FICA Taxes due, have been paid in full as of this date?    Yes x    No

*All accounts and collateral listed above is subject to the underlying Loan and Security Agreement, and any Supplement thereto, given by Seller to Far West Capital ("Purchaser").*

By: _____    Dated: December 29, 2014
    *Authorized Signature*

## EXHIBIT B



EXHIBIT B

Date: Tuesday, January 13, 2015
Time: 03:55PM
User: SYSADMIN

*mrv Parl H*

# Roadmark Corporation
## Period Sensitive Aged AR - Customer Summary Aged AR
Period: 01-15 As of: 1/13/2015

Page: 1 of 3
Report: 0861tSUM.rpt
Company: RMC

| Cust.ID / Type / Ref Nbr | Customer Name / Terms | Telephone / Doc Date | Contact | Current | Days Past Due 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|
| APACTA2407 | APAC-Atlantic, Inc. | (434) 773-2400 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ASPPAV3795 | Asphalt Paving of Shelby | (704) 739-4568 | | 31,946.25 | 0.00 | 0.00 | 0.00 | 0.00 | 31,946.25 |
| ASPPAV3809 | Asphalt Paving of Shelby, Inc. | (704) 739-4568 | | 518.40 | 0.00 | 0.00 | 0.00 | 1,240.14 | 1,758.54 |
| BARNHI3851 | Barnhill Contracting | (910) 488-1319 | | 0.00 | 0.00 | 3,378.57 | 23,948.00 | 0.00 | 27,326.57 |
| BARNTB3620 | Barnhill Contracting Company | (252) 823-1021 | | -0.87 | 0.00 | 0.00 | 0.00 | 0.00 | -0.87 |
| BARNTB3801 | Barnhill Contracting | (252) 823-1021 | | -729.81 | 729.81 | 0.00 | 0.00 | 0.00 | 0.00 |
| BLYTHE3860 | Blythe Construction, Inc. | (704) 375-7814 | | 32,961.86 | 0.00 | 0.00 | 0.00 | 0.00 | 32,961.86 |
| BOGGSP3607 | Boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 203.84 | 203.84 |
| BOGGSP3630 | Boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,540.50 | 1,540.50 |
| BOGGSP3646 | boggs Paving, Inc. | (704) 898-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 70,900.48 | 70,900.48 |
| BOGGSP3655 | Boggs Paving Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 63,507.24 | 63,507.24 |
| BOGGSP3811 | Boggs Paving, Inc. | (704) 289-8482 | | 15,221.70 | 31,492.40 | 1,285.76 | 1,114.26 | 38,289.60 | 87,403.72 |
| BRAMBL3879 | David A. Bramble, Inc. | (410) 778-3023 | | 0.00 | 13,537.25 | 0.00 | 0.00 | 0.00 | 13,537.25 |
| BRANSC3834 | Julius Branscome, Inc. | (703) 335-1000 | | 0.00 | 0.00 | 3.20 | 0.00 | 0.00 | 3.20 |
| BRITEL3837 | Brite-Line Technologies LLC | (303) 129-3202 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRJACK3816 | C R Jackson | (803) 750-8070 | | -3,363.34 | 711.06 | 26,476.75 | 0.00 | 0.00 | 23,879.47 |
| CRJACK3818 | C R Jackson | (704) 664-6042 | | 53,265.18 | 42,605.15 | 1,866.00 | 0.00 | 0.00 | 95,870.33 |
| DANECO3876 | Dane Construction | (704) 664-6042 | | 0.00 | 515.10 | 0.00 | 0.00 | 0.00 | 515.10 |
| DELLIN3741 | Dellinger Inc. | (704) 283-7561 | | 1,262.82 | 0.00 | 0.00 | 0.00 | 0.00 | 1,262.82 |
| DEVERE3845 | Devere Construction Company, Inc. | (989) 356-4411 | | 0.00 | 3,858.90 | 0.00 | 0.00 | 0.00 | 3,858.90 |
| DEVERE3857 | Devere Construction | (989) 356-4411 | | 0.00 | 3,545.59 | 0.00 | 0.00 | 0.00 | 3,545.59 |
| DEVERE3888 | Devere Construction | (919) 610-6105 | | 2,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,700.00 |
| EVWILL3704 | E.V. Williams, Inc. | (757) 420-1140 | | 64,810.89 | 0.00 | 0.00 | 0.00 | 0.00 | 64,810.89 |
| FLUORL3678 | Fluor-Lane 95, LLC | (703) 838-7170 | | 205,122.48 | 550.80 | 0.00 | 0.00 | 0.00 | 205,673.28 |
| FODAYC3724 | Francis O. Day Company | (301) 652-2400 | | 0.00 | 5,613.26 | 8,060.35 | 5,266.48 | 0.00 | 18,930.09 |
| FODAYC3844 | Francis O. Day Company | (301) 652-2400 | | 0.00 | 130,572.08 | 35,396.51 | 0.00 | 0.00 | 165,968.59 |
| FORTMY3678 | Fort Myer Construction Corporation | (202) 636-9535 | | 61,386.75 | 4,384.88 | 0.00 | 0.00 | 0.00 | 65,771.63 |
| FORTMY3721 | Fort Myer Construction | (202) 636-9535 | | 308.12 | 0.00 | 862.82 | 0.00 | 122.20 | 1,293.14 |
| FORTMY3735 | Fort Myer Construction | (202) 636-9535 | | 0.00 | 0.00 | 0.00 | 0.00 | 36.73 | 36.73 |

**EXHIBIT B**

Date: Tuesday, January 13, 2015
Time: 03:55PM
User: SYSADMIN

## Roadmark Corporation
### Period Sensitive Aged AR - Customer Summary Aged AR
Period: 01-15 As of 1/13/2015

Page: 2 of 3
Report: 0861SUM.rpt
Company: RMC

| Cust ID / Type | Ref Nbr | Customer Name / Terms | Telephone / Doc Date | Contact | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| FORTMY3792 | | Fort Myer Construction | (202) 636-9535 | | 192.50 | 13,789.02 | 26,486.78 | 0.00 | 1,768.96 | 42,237.26 |
| FORTMY3802 | | Fort Myer Construction | (202) 636-9535 | | 0.00 | 716.93 | 0.00 | 0.00 | 0.00 | 716.93 |
| FORTMY3849 | | Fort Myer | | | 0.00 | 0.00 | 7,761.90 | 0.00 | 0.00 | 7,761.90 |
| FORTMY3852 | | Fort Myer Construction Corporation | (202) 636-9535 | | -16,617.04 | 0.00 | 0.00 | 0.00 | 0.00 | -16,617.04 |
| FSMITH3821 | | Fred Smith Company | (919) 582-3686 | | -6,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | -6,700.00 |
| GRANIT3822 | | Granite Contracting | (704) 892-3041 | | 0.00 | 0.00 | 0.00 | 0.00 | 2,299.07 | 2,299.07 |
| GRANIT3828 | | Granite Contracting | (704) 892-3041 | | 0.00 | 0.00 | 0.00 | 0.00 | 5,801.81 | 5,801.81 |
| HARPER3838 | | Jack B Harper | (985) 892-6500 | | 0.00 | 4,000.00 | 12,000.00 | 4,235.50 | 94,417.10 | 114,652.60 |
| HARPER3839 | | Jack B Harper | (985) 892-6500 | | 190.12 | 0.00 | 27,000.00 | 0.00 | 109,393.72 | 136,583.84 |
| HARPER3840 | | Jack B Harper Contractor | (985) 892-6500 | | 0.00 | 0.00 | 3,100.00 | 0.00 | 74,609.43 | 77,709.43 |
| HENDER3722 | | Henderson Construction | (540) 374-3476 | | 0.00 | 1,886.15 | 9,970.08 | 0.00 | 0.00 | 11,856.23 |
| HIGHPA3866 | | Highland Paving | (910) 485-5790 | | 0.00 | 0.00 | 58,774.00 | 0.00 | 0.00 | 58,774.00 |
| IMPLUS3859 | | Implus | (919) 314-1904 | | 0.00 | 0.00 | 0.00 | 0.00 | 4,000.00 | 4,000.00 |
| KINGAS3868 | | King Asphalt Inc. | (864) 855-0338 | | 0.00 | 643.50 | 0.00 | 4,826.40 | 0.00 | 5,469.90 |
| LANECO3615 | | Lane Construction Corporation | (703) 222-5670 | | -601.92 | 0.00 | 0.00 | 0.00 | 0.00 | -601.92 |
| LANECO3719 | | The Lane Construction Corporation | (703) 222-5670 | | 3,375.76 | 0.00 | 0.00 | 0.00 | 0.00 | 3,375.76 |
| LANECO3742 | | Lane Construction | (703) 222-5670 | | 0.00 | 6,392.10 | 0.00 | 0.00 | 0.00 | 6,392.10 |
| LANECO3820 | | Lane Construction | (203) 235-3351 | | 4,052.80 | 0.00 | 0.00 | 0.00 | 0.00 | 4,052.80 |
| LAWHOR3887 | | Lawhorne Brothers Paving | (434) 239-8821 | | 10,710.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,710.00 |
| LYNCHJ3634 | | Jimmy R. Lynch & Sons, Inc. | (336) 368-4047 | | 48,675.73 | 434.75 | 183.44 | 0.00 | 0.00 | 49,293.92 |
| MOOREB2502 | | Moore Brothers Co., Inc. | (540) 248-8181 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NWRDBL3880 | | Northwest Express Roadbuilders | (678) 486-3700 | | 13,164.60 | 10,892.39 | 31,728.70 | 0.00 | 0.00 | 55,785.69 |
| ROGERS3841 | | Rogers Group | (615) 242-0585 | | 2,950.08 | 887.04 | 0.00 | 0.00 | 0.00 | 3,837.12 |
| ROGERS3842 | | Rogers Groups Inc. | (615) 242-0585 | | 24,094.56 | 0.00 | 0.00 | 0.00 | 0.00 | 24,094.56 |
| ROSEBR3819 | | Rose Brothers Paving Company, Inc. | (252) 209-8144 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,276.21 | 1,276.21 |
| RPCCON3881 | | RPC Contracting | (252) 291-3336 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,710.00 | 1,710.00 |
| RUSSJT3830 | | J.T. Russell & Sons, Inc. | (704) 982-2225 | | -145.18 | 4.89 | 0.00 | 0.00 | 0.00 | -140.29 |
| SCDOT43750 | | Sloan Construction Company | (864) 968-2280 | | 0.00 | 0.00 | 0.00 | 0.00 | 4,723.32 | 4,723.32 |
| SHARPE3882 | | Sharpe Brothers a Division of Vecellio & Gr... | (336) 235-2756 | | 0.00 | 30,487.94 | 0.00 | 0.00 | 0.00 | 30,487.94 |

EXHIBIT B

Date: Tuesday, January 13, 2015
Time: 03:55PM
User: SYSADMIN

## Roadmark Corporation
### Period Sensitive Aged AR - Customer Summary Aged AR
Period: 01-15 As of: 1/13/2015

Page: 3 of 3
Report: 0811SUM.rpt
Company: RMC

| Cust ID / Type | Ref Nbr / Terms | Customer Name | Telephone | Contact / Doc Date | Current | Days Past Due 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| SLURRY3883 | | Slurry Pavers, Inc. | (804) 264-0707 | | 0.00 | 84,267.25 | 30,751.50 | 0.00 | 0.00 | 115,018.75 |
| SLURRY3781 | | Slurry Pavers, Inc. | (804) 264-0707 | | -471.00 | 0.00 | 0.00 | 0.00 | 0.00 | -471.00 |
| SLURRY3813 | | Slurry Pavers Inc. | (804) 264-0707 | | -568.80 | 98,452.87 | 201,210.64 | 37,086.99 | 0.00 | 336,181.70 |
| SLURRY3826 | | Slurry Pavers | (804) 264-0707 | | 0.00 | 48,366.60 | 50.40 | 0.00 | 0.00 | 48,417.00 |
| SLURRY3827 | | Slurry Pavers, Inc. | (804) 264-0707 | | 0.00 | 0.00 | 0.00 | 0.00 | 17,785.32 | 17,785.32 |
| SLURRY3829 | | Slurry Pavers, Inc. | (804) 264-0707 | | -77.79 | 0.00 | 0.00 | 0.00 | 0.00 | -77.79 |
| SLURRY3855 | | Slurry Pavers | (804) 264-0707 | | 0.00 | 2,117.05 | 56,101.00 | 29,923.76 | 0.00 | 88,141.81 |
| SMITHF3785 | | Fred Smith Company | (919) 582-3546 | | 0.00 | 0.00 | 217.10 | 2,041.10 | 0.00 | 2,258.20 |
| STWOOT2414 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| STWOOT3642 | | ST Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 0.00 | 0.00 | 2,612.24 | 2,612.24 |
| STWOOT3770 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 23,458.82 | 2,012.25 | 0.00 | 25,471.07 |
| STWOOT3772 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 44,363.28 | 1,176.55 | 0.00 | 45,539.83 |
| STWOOT3779 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 300.00 | 12,247.55 | 0.00 | 12,547.55 |
| STWOOT3780 | | S.T. Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 0.00 | 0.00 | 195.00 | 195.00 |
| STWOOT3804 | | S.T. Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 130.00 | 0.00 | 10,851.32 | 10,981.32 |
| STWOOT3814 | | S.T. Wooten Corporation | (252) 291-5165 | | 0.00 | 11,398.25 | 0.00 | 10,000.00 | 0.00 | 21,398.25 |
| STWOOT3853 | | ST Wooten Corporation | (252) 291-5165 | | -1,188.66 | 0.00 | 0.00 | 0.00 | 0.00 | -1,188.66 |
| STWOOT3863 | | STWooten Corporation | (252) 291-5165 | | 92,820.55 | 45,991.00 | 6,181.15 | 0.00 | 0.00 | 144,992.70 |
| STWOOT3867 | | S.T. Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 208.90 | 0.00 | 0.00 | 208.90 |
| TEMPLE3773 | | Boxley Asphalt, LLC | (540) 777-7600 | | 0.00 | 0.00 | 137.14 | 0.00 | 0.00 | 137.14 |
| TEMPLE3810 | | Boxley Asphalt, LLC | (540) 777-7600 | | -2,040.00 | 3,206.13 | 0.00 | 0.00 | 0.00 | 1,166.13 |
| TEMPLE3823 | | Boxley Asphalt | (434) 239-0383 | | 0.00 | 0.00 | 833.87 | 0.00 | 0.00 | 833.87 |
| TOWNMO3881 | | Town of Mooresville | (980) 722-6268 | | 11,986.52 | 0.00 | 0.00 | 0.00 | 0.00 | 11,986.52 |
| WLCONS3726 | | W-L Construction & Paving | (540) 662-4008 | | -3,126.72 | 3,126.72 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZACHRY3640 | | Zachry Construction | (704) 818-5580 | | 7,874.25 | 7,706.17 | 31,383.59 | 10,797.50 | 13,074.41 | 70,835.92 |
| **Company Total** | | | | | 654,015.79 | 612,166.10 | 650,369.18 | 144,676.34 | 520,388.64 | 2,581,586.05 |

**EXHIBIT B**

Date: Tuesday, January 13, 2015
Time: 03:58PM
User: SYSADMIN

# Roadmark Corporation
## AR Transactions - Standard
### Periods: 12-14 Through 01-15 As of: 1/13/2015

Page: 1 of 1
Report: 03840.rpt
Company: RMC

**Company: RMC**

| Batch | Status Tp Ent | Tn Period | Period Posted | Ref No | Tran Date | Customer ID | Acct | Subaccount | Transaction Description | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101122 | U IN | 01-15 | 01-15 | 814788 | 1/11/2015 | LAWHOR-3887 | 1099 | 0- | LAWHOR3887 Lawhorne Bro | 10,710.00 | 0.00 |
| | | | | | | Project: 3887 | | | Cost Type:  Task: 00000000 | | |
| | | | | | | | | | Sub-Total | 10,710.00 | 0.00 |
| 803374 | P PA | 12-14 | 12-14 | 53506 | 1/8/2015 | HENDER-3722 | 1099 | 0- | HENDER3722 Henderson Co | 0.00 | 7,054.62 |
| 803374 | P PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 197.06 |
| 803374 | P PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 14,734.34 |
| 803374 | P PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 115.60 |
| 803374 | P PA | 12-14 | 12-14 | 80477927 | 1/8/2015 | LANECO-3719 | 1099 | 0- | LANECO3719 The Lane Cont | 0.00 | 35,748.48 |
| | | | | | | | | | Sub-Total | 0.00 | 58,850.10 |
| 803375 | P PA | 12-14 | 12-14 | 20123923 | 1/12/2015 | VADOTL-3490 | 1099 | 0- | VADOTL3490 VA DOT | 0.00 | 13,098.89 |
| 803375 | P PA | 12-14 | 12-14 | 20123923 | 1/12/2015 | VADOTL-3490 | 1099 | 0- | VADOTL3490 VA DOT | 0.00 | 77,516.67 |
| 803375 | P PA | 12-14 | 12-14 | 219685 | 1/12/2015 | TEMPLE-3815 | 1099 | 0- | TEMPLE3815 Boxley Asphalt | 0.00 | 61,127.31 |
| 803375 | P PA | 12-14 | 12-14 | 219685 | 1/12/2015 | TEMPLE-3815 | 1099 | 0- | TEMPLE3815 Boxley Asphalt | 0.00 | 37,668.60 |
| | | | | | | | | | Sub-Total | 0.00 | 189,411.47 |
| 803376 | U PA | 12-14 | 01-15 | 281787 | 1/13/2015 | FORTMY-3678 | 1099 | 0- | FORTMY3678 Fort Myer Con | 0.00 | 177.88 |
| 803376 | P PA | 12-14 | 01-15 | 281787 | 1/13/2015 | FORTMY-3678 | 1099 | 0- | FORTMY3678 Fort Myer Con | 0.00 | 8,922.94 |
| | | | | | | | | | Sub-Total | 0.00 | 9,100.82 |
| | | | | | | | | | Company Total | 10,710.00 | 257,362.39 |

* Multiple Installment Batch is not included in Totals
** Transactions not posted within the report periods are not included in totals.

**EXHIBIT B**

Date: Tuesday, January 13, 2015
Time: 03:54PM
User: SYSADMIN

## Roadmark Corporation
### Period Sensitive Aged AR - Customer Summary Aged AR
Period: 01-15 As of: 1/13/2015

Page: 1 of 4
Report: 0861FSUM.rpt
Company: RMC

*All*

| Cust ID / Type | Customer Name / Terms | Telephone / Doc Date | Contact | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|
| APACTA2407 | APAC-Atlantic, Inc. | (434) 773-2400 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ASPPAV3795 | Asphalt Paving of Shelby | (704) 739-4568 | | 31,946.25 | 0.00 | 0.00 | 0.00 | 0.00 | 31,946.25 |
| ASPPAV3809 | Asphalt Paving of Shelby, Inc. | (704) 739-4568 | | 518.40 | 0.00 | 0.00 | 0.00 | 1,240.14 | 1,758.54 |
| BARNEC2121 | Barnhill Contracting Co. | (252) 335-9503 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| BARNHI3351 | Barnhill Contracting | (910) 488-1319 | | 0.00 | 0.00 | 3,378.57 | 23,948.00 | 0.00 | 27,326.57 |
| BARNTB3558 | Barnhill Contracting | (252) 823-1021 | | 0.00 | 0.00 | 592.46 | 6,829.05 | 0.00 | 7,421.51 |
| BARNTB3620 | Barnhill Contracting Company | (252) 823-1021 | | -0.87 | 0.00 | 0.00 | 0.00 | 0.00 | -0.87 |
| BARNTB3801 | Barnhill Contracting | (252) 823-1021 | | -729.81 | 729.81 | 0.00 | 0.00 | 0.00 | 0.00 |
| BLYTHE3560 | Blythe Construction, Inc. | (704) 375-7814 | | 32,961.86 | 0.00 | 0.00 | 0.00 | 0.00 | 32,961.86 |
| BOGGSP3607 | Boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 203.84 | 203.84 |
| BOGGSP3630 | Boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,540.50 | 1,540.50 |
| BOGGSP3646 | boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 70,900.48 | 70,900.48 |
| BOGGSP3655 | Boggs Paving, Inc. | (704) 289-8482 | | 0.00 | 0.00 | 0.00 | 0.00 | 63,507.24 | 63,507.24 |
| BOGGSP3811 | Boggs Paving, Inc. | (704) 289-8482 | | 15,221.70 | 31,492.40 | 1,285.76 | 1,114.26 | 38,289.60 | 87,403.72 |
| BRAMBL3879 | David A. Bramble, Inc. | (410) 778-3023 | | 0.00 | 13,537.25 | 0.00 | 0.00 | 0.00 | 13,537.25 |
| BRANSC3834 | Julius Branscome, Inc. | (703) 335-1000 | | 0.00 | 3.20 | 0.00 | 0.00 | 0.00 | 3.20 |
| BRITEL3837 | Brite-Line Technologies LLC | (303) 129-3202 | | 0.00 | 0.00 | 1,866.00 | 0.00 | 0.00 | 1,866.00 |
| CKCONS2957 | CK Constructors, JV | (301) 953-0900 | | 0.00 | 0.00 | 0.00 | 0.00 | 66,497.43 | 66,497.43 |
| CLARKP2535 | Clark Pavement Marking, Inc. | (919) 362-7544 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CRJACK3816 | C R Jackson | (803) 750-6070 | | -3,308.34 | 711.06 | 26,476.75 | 0.00 | 0.00 | 23,879.47 |
| CRJACK3818 | C R Jackson | | | 53,285.18 | 42,605.15 | 0.00 | 0.00 | 0.00 | 95,870.33 |
| DANECO3876 | Dane Construction | (704) 664-5042 | | 0.00 | 515.10 | 0.00 | 0.00 | 0.00 | 515.10 |
| DELLIN3741 | Dellinger Inc. | (704) 283-7551 | | 1,262.82 | 0.00 | 0.00 | 0.00 | 0.00 | 1,262.82 |
| DEVERE3697 | Devere Construction Company | | | 13,751.42 | 0.00 | 11,801.96 | 637.67 | 0.00 | 26,191.05 |
| DEVERE3845 | Devere Construction Company, Inc. | (989) 356-4411 | | 0.00 | 3,858.90 | 0.00 | 0.00 | 0.00 | 3,858.90 |
| DEVERE3857 | Devere Construction Company, Inc. | (989) 356-4411 | | 0.00 | 3,545.59 | 0.00 | 0.00 | 0.00 | 3,545.59 |
| DEVERE3888 | Devere Construction | (919) 610-6105 | | 2,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,700.00 |
| EVWILL3704 | E.V. Williams, Inc. | (757) 420-1140 | | 64,810.89 | 0.00 | 0.00 | 0.00 | 0.00 | 64,810.89 |
| FLUORL3578 | Fluor-Lane 95, LLC | (703) 639-7170 | | 205,122.48 | 550.80 | 0.00 | 0.00 | 0.00 | 205,673.28 |

EXHIBIT B

Date: Tuesday, January 13, 2015
Time: 03:55PM
User: SYSADMIN

**Roadmark Corporation**
**Period Sensitive Aged AR - Customer Summary Aged AR**
Period: 01-15 As of 1/13/2015

Page: 2 of 4
Report: 0861TSUMA.rpt
Company: RMC

| Cust ID / Type | Ref Nbr | Customer Name / Terms | Telephone / Doc Date | Contact | Current | Days Past Due 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| FODAYC3724 | | Francis O. Day Company | (301) 652-2400 | | 0.00 | 5,613.26 | 8,050.35 | 5,266.48 | 0.00 | 18,930.09 |
| FODAYC3844 | | Francis O. Day Company | (301) 652-2400 | | 0.00 | 130,572.08 | 35,396.51 | 0.00 | 0.00 | 165,968.59 |
| FORTMY3578 | | Fort Myer Construction Corporation | (202) 636-9535 | | 61,386.75 | 4,384.88 | 0.00 | 0.00 | 0.00 | 65,771.63 |
| FORTMY3721 | | Fort Myer Construction | (202) 636-9535 | | 308.12 | 0.00 | 862.82 | 0.00 | 122.20 | 1,293.14 |
| FORTMY3735 | | Fort Myer Construction | (202) 636-9535 | | 0.00 | 0.00 | 0.00 | 0.00 | 36.73 | 36.73 |
| FORTMY3792 | | Fort Myer Construction | (202) 636-9535 | | 192.50 | 13,789.02 | 26,486.78 | 0.00 | 1,768.96 | 42,237.26 |
| FORTMY3802 | | Fort Myer Construction | (202) 636-9535 | | 0.00 | 0.00 | 716.93 | 0.00 | 0.00 | 716.93 |
| FORTMY3849 | | Fort Myer | (202) 636-9535 | | 0.00 | 0.00 | 7,761.90 | 0.00 | 0.00 | 7,761.90 |
| FORTMY3852 | | Fort Myer Construction Corporation | (202) 636-9535 | | -16,617.04 | 0.00 | 0.00 | 0.00 | 0.00 | -16,617.04 |
| FSMITH3821 | | Fred Smith Company | (919) 552-3666 | | -6,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | -6,700.00 |
| GRANIT3822 | | Granite Contracting | (704) 892-3041 | | 0.00 | 0.00 | 0.00 | 0.00 | 2,299.07 | 2,299.07 |
| GRANIT3828 | | Granite Contracting | (704) 892-3041 | | 0.00 | 0.00 | 0.00 | 0.00 | 5,801.81 | 5,801.81 |
| HARPER3838 | | Jack B Harper | (985) 892-6500 | | 0.00 | 4,000.00 | 12,000.00 | 4,235.50 | 94,417.10 | 114,652.60 |
| HARPER3839 | | Jack B Harper Contractor | (985) 892-6500 | | 190.12 | 0.00 | 27,000.00 | 0.00 | 109,393.72 | 136,583.84 |
| HARPER3840 | | Jack B Harper | (985) 892-6500 | | 0.00 | 0.00 | 3,100.00 | 0.00 | 74,609.43 | 77,709.43 |
| HENDER3722 | | Henderson Construction | (985) 374-3476 | | 0.00 | 1,886.15 | 9,970.08 | 0.00 | 0.00 | 11,886.23 |
| HIGHPA3866 | | Highland Paving | (910) 485-5790 | | 0.00 | 0.00 | 58,774.00 | 0.00 | 0.00 | 58,774.00 |
| IMPLUS3859 | | Implus | (919) 314-1904 | | 0.00 | 0.00 | 0.00 | 0.00 | 4,000.00 | 4,000.00 |
| KINGAS3868 | | King Asphalt Inc. | (864) 855-0338 | | 0.00 | 643.50 | 0.00 | 4,826.40 | 0.00 | 5,469.90 |
| LANEC03392 | | The Lane Construction Corporation | (704) 394-8354 | | 119,294.91 | 16,235.37 | 0.00 | 0.00 | 0.00 | 135,530.28 |
| LANEC03615 | | Lane Construction Corporation | (703) 222-5670 | | -601.92 | 0.00 | 0.00 | 0.00 | 0.00 | -601.92 |
| LANEC03719 | | The Lane Construction Corporation | (703) 222-5670 | | 3,375.76 | 0.00 | 0.00 | 0.00 | 0.00 | 3,375.76 |
| LANEC03742 | | Lane Construction | (703) 222-5670 | | 0.00 | 6,392.10 | 0.00 | 0.00 | 0.00 | 6,392.10 |
| LANEC03820 | | Lane Construction | (203) 235-3361 | | 4,052.80 | 0.00 | 0.00 | 0.00 | 0.00 | 4,052.80 |
| LARCOC2409 | | Larco Construction Co. | (336) 767-3500 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| LARCOC3887 | | Lawhorne Brothers Paving | (434) 239-8821 | | 10,710.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,710.00 |
| LYNCHJ3634 | | Jimmy R. Lynch & Sons, Inc. | (336) 363-4047 | | 48,675.73 | 434.75 | 183.44 | 0.00 | 0.00 | 49,293.92 |
| MOOREB2502 | | Moore Brothers Co., Inc. | (540) 248-8181 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NCDOTB3788 | | NC DOT | (252) 514-4759 | | 0.00 | 0.00 | 0.00 | 0.00 | 12,102.26 | 12,102.26 |

**EXHIBIT B**

Date:      Tuesday, January 13, 2015
Time:      03:55PM
User:      SYSADMIN

# Roadmark Corporation
## Period Sensitive Aged AR - Customer Summary Aged AR
Period: 01-15 As of: 1/13/2015

Page:       3 of    4
Report:     0861FSUM.rpt
Company:    RMC

| Cust ID | Ref Nbr | Customer Name | Telephone | Contact | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Type | | Terms | Doc Date | | | | Days Past Due | | | |
| NOVAPA3581 | | Northern Virginia Regional Park Authority | (703) 352-5900 | | 687.94 | 0.00 | 0.00 | 0.00 | 0.00 | 687.94 |
| NWRDBL3880 | | Northwest Express Roadbuilders | (678) 486-3700 | | -13,164.60 | 10,892.39 | 31,728.70 | 0.00 | 26,329.40 | 55,785.89 |
| ROGERS3841 | | Rogers Group | (615) 242-0585 | | 2,950.08 | 887.04 | 0.00 | 0.00 | 0.00 | 3,837.12 |
| ROGERS3842 | | Rogers Groups Inc. | (615) 242-0585 | | 24,094.56 | 0.00 | 0.00 | 0.00 | 0.00 | 24,094.56 |
| ROSEBR3819 | | Rose Brothers Paving Company, Inc. | (252) 209-8144 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,276.21 | 1,276.21 |
| RPCCON3861 | | RPC Contracting | (252) 261-3336 | | 0.00 | 0.00 | 0.00 | 0.00 | 1,710.00 | 1,710.00 |
| RUSSJT3830 | | J.T. Russell & Sons, Inc. | (704) 982-2225 | | -145.18 | 4.89 | 0.00 | 0.00 | 0.00 | -140.29 |
| SCDOTT3705 | | South Carolina Department of Transportatio | (803) 737-2314 | | 3,948.42 | 9,758.00 | 39,736.48 | 4,928.98 | 44,699.04 | 103,070.92 |
| SCDOT23627 | | South Carolina Dept of Transportation | (803) 737-2314 | | 0.00 | 0.00 | 0.00 | 0.00 | 47,919.83 | 47,919.83 |
| SCDOT33791 | | SC DOT | (303) 373-7231 | | 419,932.17 | 55,231.30 | 3,006.88 | 0.00 | 0.00 | 478,170.35 |
| SCDOT43750 | | Sloan Construction Company | (864) 968-2250 | | 0.00 | 0.00 | 0.00 | 0.00 | 4,723.32 | 4,723.32 |
| SCDOT53638 | | SC DOT | (843) 661-4710 | | 0.00 | 0.00 | 0.00 | 97,939.95 | 523,173.76 | 621,173.76 |
| SCDOT63637 | | SC DOT | (843) 740-1665 | | 0.00 | 0.00 | 109,936.85 | 0.00 | 121,021.62 | 121,021.62 |
| SCDOT83639 | | SC DOT | (803) 631-6850 | | 12,958.26 | 9,937.91 | 53,369.18 | 0.00 | 205,492.07 | 281,757.42 |
| SHARPE3882 | | Sharpe Brothers a Division of Vecellio & Gro | (336) 235-2756 | | 0.00 | 30,487.94 | 0.00 | 0.00 | 0.00 | 30,487.94 |
| SLURRY3883 | | Slurry Pavers, Inc. | (804) 264-0707 | | 0.00 | 84,267.25 | 30,751.50 | 0.00 | 0.00 | 115,018.75 |
| SLURRY3781 | | Slurry Pavers, Inc. | (804) 264-0707 | | -471.00 | 0.00 | 0.00 | 0.00 | 0.00 | -471.00 |
| SLURRY3813 | | Slurry Pavers Inc. | (804) 264-0707 | | -568.80 | 98,452.87 | 201,210.64 | 37,086.99 | 336,181.70 | |
| SLURRY3826 | | Slurry Pavers | (804) 264-0707 | | 0.00 | 48,366.60 | 50.40 | 0.00 | 0.00 | 48,417.00 |
| SLURRY3827 | | Slurry Pavers, Inc. | (804) 264-0707 | | 0.00 | 0.00 | 0.00 | 0.00 | 17,785.32 | 17,785.32 |
| SLURRY3829 | | Slurry Pavers, Inc. | (804) 264-0707 | | -77.79 | 0.00 | 0.00 | 0.00 | 0.00 | -77.79 |
| SLURRY3855 | | Slurry Pavers | (804) 264-0707 | | 2,117.05 | 2,117.05 | 56,101.00 | 29,923.76 | 0.00 | 88,141.81 |
| SMITHF3785 | | Fred Smith Company | (919) 552-3546 | | 0.00 | 217.10 | 2,041.10 | 0.00 | 0.00 | 2,258.20 |
| STWOOT2414 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| STWOOT3447 | | S T Wooten Corporation | (252) 291-5165 | | 154,240.58 | 0.00 | 0.00 | 0.00 | 0.00 | 154,240.58 |
| STWOOT3641 | | S.T. Wooten Corporation | | | 0.00 | 0.00 | 0.00 | 44,694.71 | 12,078.13 | 56,772.84 |
| STWOOT3642 | | ST Wooten Corporation | | | 0.00 | 0.00 | 0.00 | 0.00 | 2,612.24 | 2,612.24 |
| STWOOT3770 | | S T Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 23,458.82 | 2,012.25 | 25,471.07 | |
| STWOOT3772 | | S.T. Wooten Corporation | (252) 291-5165 | | 0.00 | 0.00 | 44,363.28 | 1,176.55 | 0.00 | 45,539.83 |

EXHIBIT B

Date: Tuesday, January 13, 2015
Time: 03:55PM
User: SYSADMIN

Page: 4 of 4
Report: 0861ISUM.rpt RMC
Company:

# Roadmark Corporation
## Period Sensitive Aged AR - Customer Summary Aged AR
### Period: 01-15 As of 1/13/2015

| Cust ID | Ref Nbr | Type | Customer Name | Terms | Telephone | Contact | Current | Days Past Due 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---------|---------|------|---------------|-------|-----------|---------|---------|----------|----------|----------|---------|-------|
| STWOOT3779 | | | S.T. Wooten Corporation | | (252) 291-5165 | | 0.00 | 0.00 | 300.00 | 12,247.55 | 0.00 | 12,547.55 |
| STWOOT3780 | | | S.T. Wooten Corporation | | (252) 291-5165 | | 0.00 | 0.00 | 0.00 | 0.00 | 195.00 | 195.00 |
| STWOOT3804 | | | S.T. Wooten Corporation | | (252) 291-5165 | | 0.00 | 0.00 | 130.00 | 0.00 | 10,851.32 | 10,981.32 |
| STWOOT3814 | | | S.T. Wooten Corporation | | (252) 291-5165 | | 0.00 | 11,398.25 | 0.00 | 10,000.00 | 0.00 | 21,398.25 |
| STWOOT3853 | | | ST Wooten Corporation | | (252) 291-5165 | | -1,188.66 | 0.00 | 0.00 | 0.00 | 0.00 | -1,188.66 |
| STWOOT3863 | | | ST Wooten Corporation | | (252) 291-5165 | | 92,820.55 | 45,991.00 | 6,181.15 | 0.00 | 0.00 | 144,992.70 |
| STWOOT3867 | | | S.T. Wooten Corporation | | (252) 291-5165 | | 0.00 | 0.00 | 208.50 | 0.00 | 0.00 | 208.50 |
| TEMPLE3773 | | | Boxley Asphalt, LLC | | (540) 777-7600 | | 0.00 | 0.00 | 137.14 | 0.00 | 0.00 | 137.14 |
| TEMPLE3810 | | | Boxley Asphalt, LLC | | (540) 777-7600 | | -2,040.00 | 3,206.13 | 0.00 | 0.00 | 0.00 | 1,166.13 |
| TEMPLE3823 | | | Boxley Asphalt | | (434) 239-0383 | | 0.00 | 0.00 | 833.87 | 0.00 | 0.00 | 833.87 |
| TOWNMO3881 | | | Town of Mooresville | | (980) 722-8268 | | 11,986.52 | 0.00 | 0.00 | 0.00 | 0.00 | 11,986.52 |
| VADOTB3489 | | | VA DOT | | | | 0.00 | 319.98 | 0.00 | 0.00 | 0.00 | 319.98 |
| VADOTL3490 | | | VA DOT | | | | 19,369.50 | 0.00 | 0.00 | 0.00 | 0.00 | 19,369.50 |
| WLCONS3726 | | | W-L Construction & Paving | | (540) 662-4008 | | -3,126.72 | 3,126.72 | 0.00 | 0.00 | 0.00 | 0.00 |
| ZACHRY3640 | | | Zachry Construction | | (704) 818-6580 | | 7,874.25 | 7,706.17 | 31,383.59 | 10,797.50 | 13,074.41 | 70,835.92 |
| GRANIT2097 | | | Granite Construction Co. | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NCCONS2303 | | | North Carolina Constructors | | (919) 217-9670 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NPSBRP2491 | | | National Park Service | | (828) 271-4773 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SCDOT12334 | | | SC DOT (District 1) | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | Company Total | 1,398,198.59 | 704,241.12 | 875,049.58 | 292,877.65 | 1,443,465.98 | 4,713,833.32 |

**EXHIBIT B**

Date: Tuesday, January 13, 2015
Time: 09:40AM
User: SYSADMIN

# Roadmark Corporation
## Period Sensitive Aged AR - Customer Summary Aged AR
### Period: 01-15 As of: 1/13/2015

Page: 1 of 1
Report: 0861ISUM.rpt
Company: RMC

| Cust ID | Type Ref Nbr | Customer Name Terms | Telephone Contact | Doc Date | Current | Days Past Due 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| BARNTB3558 | | Barnhill Contracting | (252) 823-1021 | | 0.00 | 592.46 | 6,829.05 | 0.00 | 0.00 | 7,421.51 |
| CKCONS2957 | | CK Constructors, JV | (301) 963-0900 | | 0.00 | 0.00 | 0.00 | 0.00 | 66,497.43 | 66,497.43 |
| DEVERE3697 | | Devere Construction Company | | | 13,751.42 | 0.00 | 11,801.96 | 637.67 | 0.00 | 26,191.05 |
| LANECO3392 | | The Lane Construction Corporation | (704) 394-8364 | | 119,294.91 | 16,235.37 | 0.00 | 0.00 | 0.00 | 135,530.28 |
| NCDOTB3788 | | NC DOT | (252) 514-4789 | | 0.00 | 0.00 | 0.00 | 0.00 | 12,102.26 | 12,102.26 |
| NOVAPA3581 | | Northern Virginia Regional Park Authority | (703) 352-5900 | | 687.94 | 0.00 | 0.00 | 0.00 | 0.00 | 687.94 |
| SCDOT13705 | | South Carolina Department of Transportatio | (803) 737-2314 | | 3,948.42 | 9,758.00 | 39,736.48 | 4,928.98 | 44,699.04 | 103,070.92 |
| SCDOT23627 | | South Carolina Dept. of Transportation | (803) 737-2314 | | 0.00 | 0.00 | 0.00 | 0.00 | 47,919.83 | 47,919.83 |
| SCDOT33791 | | SC DOT | (803) 373-7231 | | 419,932.17 | 55,291.30 | 0.00 | 0.00 | 0.00 | 478,170.35 |
| SCOTS3638 | | SC DOT | (843) 661-4710 | | 0.00 | 0.00 | 109,336.85 | 97,939.95 | 413,296.96 | 621,173.76 |
| SCDOT63637 | | SC DOT | (843) 740-1665 | | 0.00 | 0.00 | 0.00 | 0.00 | 121,021.62 | 121,021.62 |
| SCDOT73639 | | SC DOT | (803) 531-6850 | | 12,958.26 | 9,937.91 | 53,369.18 | 0.00 | 205,492.07 | 281,757.42 |
| STWOOT3447 | | S T Wooten Corporation | (252) 291-5165 | | 154,240.58 | 0.00 | 0.00 | 0.00 | 0.00 | 154,240.58 |
| STWOOT3541 | | S.T. Wooten Corporation | | | 0.00 | 0.00 | 0.00 | 44,694.71 | 12,078.13 | 56,772.84 |
| VADOTB3489 | | VA DOT | | | 0.00 | 319.98 | 0.00 | 0.00 | 0.00 | 319.98 |
| VADOTL3490 | | VA DOT | | | 19,369.50 | 0.00 | 0.00 | 0.00 | 0.00 | 19,369.50 |
| Company Total | | | | | 744,183.20 | 92,075.02 | 224,680.40 | 148,201.31 | 923,107.34 | 2,132,247.27 |

EXHIBIT B

1/13/201                                    RETAINAGE REPORT

| RMC Job | Project Description | Contract Number | Retainage |
|---|---|---|---|
| 2957 | CK Constructors_I-95 | 0095-96A-105 ,C501 | $8,368.57 |
| 3521 | Fred Smith Company_Wake-Dur | C202875;47030.3.1 | $171.41 |
| 3578 | Fluor-Lane 95_I-95 HOV HOT I | 0095-969-074, C501 | $83,012.42 |
| 3615 | Lane Construction_City of Alexa | (RFP)00000211 | $2,696.01 |
| 3617 | Lane Construction_Mecklenburg | C203131 | $4,646.48 |
| 3634 | Jimmy R Lynch and Sons Inc_Gu | C202648 | $6,128.10 |
| 3640 | Zachry Construction_Iredell | C202602 | $7,240.83 |
| 3641 | S T Wooten_Brunswick, New Ha | C203192 | $22,700.33 |
| 3642 | ST Wooten_Johnston | C203184 | $1,136.94 |
| 3649 | ST Wooten_Alamance | C203191 | $7,892.77 |
| 3685 | Amer Infrastructure_Worcester | XY3235177 | $8,094.72 |
| 3702 | American Infrastructure_Wicomi | XY3225177 | $8,380.52 |
| 3709 | American Infrastructure_Caroline | CO4155177 | $11,762.78 |
| 3711 | Lane Construction_Chester York | 12.042242 | $6,330.73 |
| 3719 | Lane Construction_Prince Willia | 0095-076-005, M501 | $46,309.48 |
| 3720 | S T Wooten Corporation_Beaufo | DB00112 | $222.16 |
| 3724 | Francis O Day Company_Marlbc | XY3165277 | $26,366.97 |
| 3730 | American Infrastructure_Accoma | PM5G-001-632, P401 | $574.90 |
| 3750 | Sloan Construction_York | 46.039176 | $899.63 |
| 3751 | American Infrastrcuture_Somerse | SO4415177 | $9,552.40 |
| 3770 | S T Wooten Corporation_Johnsto | DD00097 | $565.71 |
| 3772 | S T Wooten Corporation_Wayne | DD00099 | $351.77 |
| 3779 | S T Wooten Corporation_Wilson | DD00104 | $2,236.58 |
| 3780 | S T Wooten Corporation_Pender | 3CR.20711.149 | $111.60 |
| 3785 | Fred Smith Company_Sampson | C203161 | $646.88 |
| 3802 | Fort Myer Construction_Loudon | QQ-01790 | $1,334.95 |
| 3804 | S T Wooten_Franklin | C203452 | $7,161.27 |
| 3830 | J T RUSSELL AND SONS_Alex | DL00052 | $1,446.09 |
| 3841 | Rogers Group_Dickenson Lee Sc | (FO)PM1C-961-F15,N50 | $17,709.60 |
| 3842 | Rogers Group_Buchanan Russell | PM1D-961-F15, N501 | $9,511.17 |
| 3849 | Fort Myer_Tysons Corner | | $773.81 |
| 3853 | ST Wooten_Vance | C203543 | $8,378.27 |
| 3857 | Devere Construction_Leesville R | PW2011-05 | $407.70 |
| 3863 | ST Wooten_Warren Franklin | C203542 | $7,011.69 |
| 3865 | Jimmy R Lynch and Sons_Piedm | 04-01-06780 | $2,030.05 |
| 3867 | ST Wooten_Brunswick New Han | 3.101011 | $552.58 |

**EXHIBIT B**

1

1/13/201                                RETAINAGE REPORT

| RMC Job | Project Description | Contract Number | Retainage |
|---------|--------------------|-----------------|-----------|
| 3876 | Dane Construction_Franklin | C203390 | $118.75 |
| 3879 | David A Bramble Inc_Dorchester | DO2995177 | $8,302.07 |
| Grand Total: | | | $331,138.69 |

EXHIBIT B

2

Date: Tuesday, January 13, 2015
Time: 09:44 AM
User: SYSADMIN

# Roadmark Corporation
## AR Transactions - Standard
Periods: 12-14 Through 01-15 As of: 1/13/2015

Page: 1 of 1
Report: 08640.rpt
Company: RMC

**Company: RMC**

| Batch | Status | Tn Tp | Period Ent | Period Posted | Posted Ref No | Tran Date | Customer ID | Acct | Subaccount | Transaction Description | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101122 | U | IN | 01-15 | 01-15 | 814788 | 1/11/2015 | LAWHOR-3887 | 1099 | 0-3887 | LAWHOR3887 Lawhorne Bro | 10,710.00 | 0.00 |
| | | | | | | | | | Project: 3887 | Task: 00000000 Cost Type: | | |
| | | | | | | | | | | Sub-Total | 10,710.00 | 0.00 |
| 803374 | P | PA | 12-14 | 12-14 | 53506 | 1/8/2015 | HENDER-3722 | 1099 | 0- | HENDER3722 Henderson Co | 0.00 | 7,054.62 |
| 803374 | P | PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 197.06 |
| 803374 | P | PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 14,734.34 |
| 803374 | P | PA | 12-14 | 12-14 | 80477810 | 1/8/2015 | LANECO-3820 | 1099 | 0- | LANECO3820 Lane Construc | 0.00 | 115.60 |
| 803374 | P | PA | 12-14 | 12-14 | 80477927 | 1/8/2015 | LANECO-3719 | 1099 | 0- | LANECO3719 The Lane Cons | 0.00 | 36,748.48 |
| | | | | | | | | | | Sub-Total | 0.00 | 58,850.10 |
| 803375 | P | PA | 12-14 | 12-14 | 20123923 | 1/12/2015 | VADOTL-3490 | 1099 | 0- | VADOTL3490 VA DOT | 0.00 | 13,098.89 |
| 803375 | P | PA | 12-14 | 12-14 | 20123923 | 1/12/2015 | VADOTL-3490 | 1099 | 0- | VADOTL3490 VA DOT | 0.00 | 77,516.67 |
| 803375 | P | PA | 12-14 | 12-14 | 219685 | 1/12/2015 | TEMPLE-3815 | 1099 | 0- | TEMPLE3815 Boxley Asphalt | 0.00 | 61,127.31 |
| 803375 | P | PA | 12-14 | 12-14 | 219685 | 1/12/2015 | TEMPLE-3815 | 1099 | 0- | TEMPLE3815 Boxley Asphalt | 0.00 | 37,668.60 |
| | | | | | | | | | | Sub-Total | 0.00 | 189,411.47 |
| | | | | | | | | | | **Company Total** | 10,710.00 | 248,261.57 |

\* Multiple Installment Batch is not included in Totals

\*\* Transactions not posted within the report periods are not included in totals.

EXHIBIT B

# Roadmark Corporation
## AR Transactions - Standard
Periods: 12-14 Through 01-15 As of: 1/13/2015

Page: 1 of 1
Report: 08640.rpt
Company: RMC

**Company: RMC**

| Batch | Tn Status Tp | Period Ent | Period Posted | Ref No | Tran Date | Customer ID | Acct | Subaccount | Transaction Description | Debit Amount | Credit Amount |
|-------|-----|-----|-----|--------|-----------|-------------|------|------------|-------------------------|--------------|---------------|
| 101121 | U CM 01-15 | 01-15 | 814787 | | 1/9/2015 | BLYTHE-3860 | 1089 Project: | 0- 3860 | BLYTHE3860 Blythe Construc Cost Type: | 0.00 | 20,449.64 |
| | | | | | | | | | Task: 00000000 Sub-Total | 0.00 | 20,449.64 |
| 101122 | U CM 01-15 | 01-15 | 814789 | | 1/11/2015 | LANECO-3392 | 1099 Project: | 0- 3392 | LANECO3392 The Lane Cons Cost Type: | 0.00 | 548.78 |
| | | | | | | | | | Task: 00000000 Sub-Total | 0.00 | 548.78 |
| | | | | | | | | | Company Total | 0.00 | 20,998.42 |

**EXHIBIT B**

February 13, 2015

Jim Shober
Schober & Shober, PC
400 W. 15th Street, Suite 404
Austin, TX 78701

VIA EMAIL

     Re:    Roadmark Corp. (Case No. 14-00432-5-DMW)

Dear Jim:

     We have reviewed your letter dated February 11, 2015, in which you assert there are discrepancies in the debtor's financial reporting. Attached is a reconciliation, showing the changes in accounts receivable from January 13, 2015, to February 1, 2015. As you will see, after January 13, 2015, but prior to the bankruptcy filing on January 26, 2015 (the "Petition Date"), Roadmark Corporation (the "Debtor") received payments on accounts receivable totaling $478,544.77, reducing the total amount of accounts receivable (including retainage) on the Petition Date to $4,566,426.23. During the week beginning on the Petition Date and ending on February 1, 2015, the Debtor had additional receipts of $53,444.38, and generated new billings of $249,208.72. However, during this week, the Debtor also completed its year-end closing procedures, which resulted in certain write-offs and sales adjustments totaling $105,979.17. Thus, the attached reconciliation reflects an ending accounts receivable balance of $4,656,211.44, and there are no "unaccounted for" changes in receivables.[1] Please feel free to contact John or myself if you have any additional questions.

     I would like to bring a couple of additional matters to your attention. First, the Debtor wired Far West an adequate protection payment of $10,000 on February 2. However, the Debtor subsequently received a wire for $10,000 from Far West. We believe that the adequate protection payment may have been erroneously returned by Far West under the assumption that it was a forwarded receivable. The Debtor has emailed Far West about this on two occasions, but has received no response. Please advise whether this payment was an adequate protection payment that was erroneously refunded. If so, the debtor will re-issue the payment.

---

[1] There is a small discrepancy of $1,129.40, which we are confident would be resolved with further review and analysis. However, the Debtor elected not to reconcile this remaining small discrepancy, given the significant constraints on the David Rosenthal's time.

**EXHIBIT C**

Second, based on the Debtor's discussions with S.T. Wooton Corporation, it appears that Far West contacted S.T. Wooton on January 28, and indicated that debts owed to the Roadmark Corporation should be paid directly to Far West. I have attached the communication, which also contains a notation that Tim Brown of Far West called S.T. Wooton. These actions were in violation of the automatic stay of 11 U.S.C. § 362. Please direct your client to immediately cease any further stay violations.

Sincerely,

NORTHEN BLUE, L.L.P.

*/s John Paul H. Cournoyer*

John Paul H. Cournoyer

**EXHIBIT C**

Accounts Receivable Reconciliation for Far West

Beginning AR                                                                                    $5,044,971.00

Less:   Receipts deposited immediately prior to Petition

| | | | |
|---|---|---|---|
| 20 | Barnhill | 3558 | $6,829.05 |
| 20 | Henderson Construction | 3722 | $9,626.44 |
| 20 | EV Williams | 3704 | $64,810.89 |
| 20 | FO Day | 3844 | $146,485.22 |
| 20 | American Infrastructure 1 of 2 | 3730 | $574.90 |
| 20 | American Infrastructure 2 of 2 | 3751 | $9,552.40 |
| 20 | Rogers Group | 3842 | $15,400.10 |
| 20 | Rogers Group | 3841 | $2,655.07 |
| 20 | Lane Construction | 3711 | $6,330.73 |
| 20 | ST Wooten Corp | 3863 | $118,249.25 |
| 20 | CK Constructors | 2957 | $30,783.82 |
| 23 | Asphalt Paving | 3795 | $26,180.56 |
| 23 | ST Wooten Corp | 3772 | $41,066.34 |

                                                        $478,544.77

        Running Balance                                                                       $4,566,426.23

Receipts deposited and recorded initial week post petition

| | | | |
|---|---|---|---|
| 30 | SCDOT | 3705 | $4,612.68 |
| 30 | Northern Va Reg Park Auth | 3581 | $687.94 |
| 30 | Sharpe Brothers | 3882 | $30,387.56 |
| 30 | Devere Construction | 3697 | $13,756.20 |
| 30 | Implus Corp | 3859 | $4,000.00 |

        Running Balance                         $53,444.38                                     $4,512,981.85

Billings after last AR report

| | | |
|---|---|---|
| VDOT | 3490 | $125,592.00 |
| Rogers Group | 3841 | $2,926.08 |
| Devere Construction | 3697 | $1,376.32 |
| Lane Construction | 3392 | $13,973.56 |
| ST Wooten | 3447 | $20,125.40 |
| SCDOT Dist 3 | 3791 | $36,744.24 |
| Asphalt Paving of Shelby | 3795 | $8,826.50 |
| Asphalt Paving of Shelby | 3809 | $7,544.90 |
| CR Jackson | 3818 | $1,624.35 |
| Blythe Construction | 3860 | $1,475.49 |
| Northwest Corridor | 3880 | $28,999.88 |

        Running Balance                         $249,208.72                                    $4,762,190.57

                                                                                    <u>EXHIBIT C</u>

Write offs and sales adjustments recorded during year end closing procedures

| | | | |
|---|---|---:|---:|
| CK Constructors | 2957 | $44,004.09 | |
| SCDOT | 3379 | $1,500.00 | |
| Blythe | 3860 | $20,449.64 | |
| Lane | 3392 | $548.78 | |
| Granite | 3822 | $2,299.07 | |
| Rose brothers | 3819 | $1,276.21 | |
| Slurry Pavers | 3827 | $17,785.32 | |
| Fred Smith | 3785 | $2,258.20 | |
| ST Wooten | 3779 | $1,795.77 | |
| Zachary | 3640 | $13,640.09 | |
| Asphalt Paving of Shelby | 3795 | $422.00 | |
| | | $105,979.17 | $4,656,211.40 |
| Balance per reports | | | $4,655,082.00 |
| Discrepancy pending resolution | | | -$1,129.40 |

EXHIBIT C



# FAR WEST
# C A P I T A L

July 11, 2014

S.T. Wooten Corporation              252-291-5165
P.O. Box 2408                        252-243-0900

Wilson NC 27893

*Received 1/28 by STW A/P by email by (call to STW by Tim Brown of FarWest)*

RE: Assignment of Accounts Receivable of Roadmark Corporation

Dear Accounts Payable Manager:

Far West Capital is proud to inform you that we have entered in to a financing agreement to provide growth capital for another successful company. Pursuant to this agreement, Roadmark Corporation, has granted us an assignment of all current and future accounts receivable.

Until you receive contrary written communication from us and to the extent that you are now indebted or may in the future become indebted to the client on an account or a general intangible, payment there of is to be made payable to us and not the Client or any other entity. Payment in any other way will not discharge this obligation.

| Please remit payment(s) to:<br>**Far West Capital**<br>**FBO Roadmark Corporation**<br>**P.O. Box 30317**<br>**Austin, TX 78755** | **Wire Instructions**<br>**Bank Name: Capital One Bank**<br>**106 East 6th Street, Suite 600, Austin TX 78701**<br>**ACH ABA: 113024915**<br>**Wire ABA: 111901014**<br>**Acct #: 3820875949**<br>**Acct Name: DSCH Capital Partners, LLC**<br>**            dba Far West Capital**<br>**Further Credit: Roadmark Corporation** |
|---|---|

Please acknowledge receipt by signing below and faxing a copy of this letter to us at 512-527-1101 or 512-527-1102. We appreciate your prompt attention to this matter.

_____

_____
Name & Title          Date

Sincerely,

Jamie Roeling
Far West Capital

4601 Spicewood Springs Rd Building 2, Suite 200 Austin, TX 78759 ▫ 512-527-1100 phone ▫ 512-527-1101 fax

<u>EXHIBIT C</u>

# SCHOBER & SCHOBER, PC

400 W. 15th Street, Suite 404
Austin, Texas 78701

512.474.7678 (main)
512.498.1333 (facsimile)
www.schoberlegal.com

Jim Schober
512.791.1499 (direct/mobile)
jim@schoberlegal.com

February 13, 2015

*Via e-mail (jan@nbfirm.com)*
*Via e-mail (jpc@nbfirm.com)*
*and facsimile (919) 942-6603*
John A. Northen, Esq.
John Paul H. Cournoyer, Esq.
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208

Re:     *In re Roadmark Corp.*, Case No. 15-00432-5-DMW, in the United States
        Bankruptcy Court for the Eastern District of North Carolina (Raleigh Division)

### Demand for Protection and Accounting of Funds Held In Trust

Dear John and JP:

I am in receipt of your letter of even date, in which you acknowledge that during the thirteen-day period that preceded the filing of its chapter 11 petition, the debtor received payments totaling $478,544.77 on accounts receivable that my client, Far West Capital, had the exclusive right to collect. As I have previously indicated, those payments were (and continue to be) held in trust for my client, Far West Capital, pursuant to the express provisions of the parties' July 7, 2015 *Loan and Security Agreement* (as amended, the "LSA"). The debtor's apparent decision to disregard its fiduciary duties, and to collect and use trust funds in order to finance its chapter 11 case, has a host of legal implications.

Most importantly, it is well-settled that funds that are held in trust are not property of the bankruptcy estate. "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990); *see also* 11 U.S.C. § 541(d); *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enterprises, Inc.*, 960 F.2d 366, 371 (3rd Cir.1992). In other words, the debtor has used Far West's property to finance its bankruptcy case, very much like a

**EXHIBIT D**

John A. Northern, Esq.
John Paul H. Cournoyer, Esq.
February 13, 2015
Page 2

law firm financing its bankruptcy case using funds held in a client trust account. Every dollar spent by the bankruptcy estate is an additional and continuing breach of the debtor's fiduciary duty to Far West.

**On behalf of Far West, demand is hereby made that the debtor, Roadmark Corporation: (a) immediately cease and desist making expenditures using funds (or proceeds of funds) that, as of the petition date, were held in trust under applicable nonbankruptcy law[1]; and (b) no later than the close of business on Monday, February 16, 2015, provide Far West with an accounting of the $478,544.77 collected by Roadmark between January 13, 2015 and January 26, 2015. Among other things, the accounting should identify all remaining proceeds of the applicable trust funds.**

Further, by converting Far West's collateral prior to the petition date, the debtor has exposed its customers and contract counterparties to a risk of double liability. As permitted by Section 4.4 of the LSA and Section 9-607(a) of the Uniform Commercial Code ("UCC"), most or all of Roadmark's account debtors were notified that payments on accounts receivable should be directed to Far West. To the extent that they ignored those instructions, they did so at their own peril under the express provisions of UCC § 9-406(a):

> *[A]n account debtor on an account, . . . may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.*

*See, e.g.,* N.C.G.S. § 25-9-406(a); Tex. Bus. Comm. Code § 9.406(a). Based on the foregoing, it is Far West's position that to the extent that any account debtor paid Roadmark in disregard of a notice of assignment, the account debtor is not discharged from the obligation and Far West retains the right to collect these accounts directly from Roadmark's account debtors. Absent another resolution, it is Far West's intention to seek emergency relief from the automatic stay to do precisely that.

---

[1] Section 10.19 of the LSA provides that it is governed by Texas law.

**EXHIBIT D**

John A. Northern, Esq.
John Paul H. Cournoyer, Esq.
February 13, 2015
Page 3

It is Far West's sincere desire to resolve these matters without an emergency hearing, but under the circumstances, there appears to be little that the debtor can offer in terms of a resolution. Based on the financial information we have to date, it seems that the only way that the debtor can continue operating in chapter 11 is to do so with funds held in trust. If you believe otherwise, please do not hesitate to call at any time—day or evening, week or weekend. My mobile number is listed at the head of this letter.

<div style="margin-left: 40%;">

Sincerely,


/s/ Jim Schober _____
Jim Schober

</div>

JMS/clm

cc:    Teresa Schober, Esq.
       Jeb Jeutter, Esq.
       Brian C. Behr, Esq.
       Mr. Brian Center
       Mr. Gregg Geill
       Ms. Jamie Roeling

<div style="text-align: right;">

**EXHIBIT D**

</div>

# NORTHEN BLUE, L.L.P.

A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
THE EXCHANGE AT MEADOWMONT
1414 RALEIGH ROAD
SUITE 435
CHAPEL HILL, NORTH CAROLINA 27517

JOHN A. NORTHEN
J. WILLIAM BLUE, JR.
DAVID M. ROOKS
VICKI L. PARROTT
STEPHANIE OSBORNE
JOHN PAUL H. COURNOYER

MAILING ADDRESS:
P.O. BOX 2208
CHAPEL HILL, NC 27515-2208

TELEPHONE (919) 968-4441
TELEFAX (919) 942-6603
WWW.NORTHENBLUE.COM
EMAIL:  JPC@NBFIRM.COM

February 16, 2015

Jim Shober
Schober & Shober, PC
400 W. 15th Street, Suite 404
Austin, TX 78701

**VIA EMAIL**

Re:  *In re Roadmark Corp.*, Case No. 15-00432-5-DMW,

Dear Jim:

We have reviewed your letter dated February 13, 2015. Inserting trust language into a loan agreement is not sufficient to convert what is in substance a secured transaction into a trust relationship. *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334 (U.S. 1934) (holding that a transaction was in substance a secured transaction, and an "obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust"). We believe it is beyond reasonable dispute that Far West's interest in receivables and proceeds of receivables is that of a secured creditor, not of the beneficiary under a trust. Therefore, the Debtor intends to continue using its cash from receivables pursuant to the existing interim cash collateral order.

Sincerely,

NORTHEN BLUE, L.L.P.

*/s John Paul H. Cournoyer*

John Paul H. Cournoyer

Exhibit E

## CERTIFICATE OF SERVICE

I, Kathy R. Dyer, do hereby certify that the attached document was served this day upon the parties listed below by mailing a copy thereto to each such party at the address indicated below with its proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Postal Service or via CME/CF on the 19th day of February, 2015.

SERVED:

Marjorie K. Lynch, Esquire
Bankruptcy Administrator
434 Fayetteville Street, Suite 620
Raleigh, North Carolina 27601
via CM/ECF

John A. Northen
Vicki L. Parrott
John Paul H. Cournoyer
Northen Blue, LLP
P.O. Box 2208
Chapel Hill, NC  27515-2208
Attorneys for Debtor
via CM/ECF


*s/Kathy R. Dyer*
Kathy R. Dyer, Paralegal
Gerald A. Jeutter, Jr., Attorney at Law, PA
615 Oberlin Road, Suite 102
Raleigh, North Carolina 27605
Telephone: 919-334-6631

15