IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROADMARK CORPORATION,<br><br>    DEBTOR | CASE NO. 15-00432-5-DMW<br>CHAPTER 11 |
| **Motion for Authorization to Enter into Premium Finance Agreement for Worker's Compensation Insurance with IPFS Corporation** ||

    NOW COMES Roadmark Corporation (the "Debtor") and moves the Court pursuant to § 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure as follows:

    1.    On January 26, 2015 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its assets as debtor-in-possession.

    2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

    3.    The Debtor previously obtained worker's compensation insurance through North Carolina's assigned risk pool administered by the N.C. Rate Bureau, since it had been unable to locate insurance directly in the private market. This Court authorized the Debtor to enter into a certain Premium Finance Agreement to finance its workers compensation premiums, among other insurance coverages, pursuant to a certain Consent Order [Docket No. 100].

    4.    The total worker's compensation premiums financed under the Consent Order were $458,840.00. However, upon being placed with the obligation to provide insurance through the assigned risk pool, Travelers Insurance audited the Debtor's payroll, and determined that the worker's compensation premiums should be substantially increased. Specifically, it declared that the worker's compensation premiums in North Carolina should be increased to approximately $748,000, and a similar increase would also be required for Virginia. The Debtor

estimates that if it maintained insurance through Travelers Insurance and the assigned risk pool, the total worker's compensation premiums would be approximately $1.2 million.

5. However, the Debtor has now been able to locate insurance in the private market, which will be substantially cheaper than the insurance provided through the assigned risk pool. Specifically, the Debtor has located worker's compensation insurance through QBE Insurance Corporation, which will cover all states and have total premiums of $701,511.00.

6. Subject to this Court's approval, the Debtor intends to terminate the worker's compensation coverage through Travelers Insurance, and obtain replacement insurance through QBE Insurance. The Debtor anticipates that it shall receive a premium refund of approximately $160,000 upon the termination of the insurance obtained through the assigned risk pool.

7. IPFS Corporation has agreed to finance the premiums under the policy with QBE Insurance, pursuant to the premium finance agreement attached as Exhibit A (the "WC Agreement"), which is made a part hereof by reference. The WC Agreement provides that the premiums for worker's compensation shall be financed through an initial down payment of $140,302.20, and 10 monthly installments of $57,981.14.

8. However, IPFS Corporation requires approval from the Court before proceeding with the premium financing arrangement, and has requested the entry of an Order substantially in the form of that attached hereto as Exhibit B.

9. The Debtor seeks entry of an Order, in substantially the same form as that attached hereto as Exhibit B, authorizing the Debtor to enter into the WC Agreement.

10. It is necessary to the Debtor's post-petition operations that it have the appropriate insurance coverages in place, and the worker's compensation insurance obtained through QBE Insurance will be substantially less expensive than that Debtor's insurance placed through the assigned risk pool. In order for the Debtor to work on its various jobs, it must provide certificates of insurance. Therefore, the Debtor's ability to perform under its various contracts is contingent on an order of this Court approving the WC Agreement, and this is an urgent matter. The Debtor shall file a separate motion requesting that the hearing on this Motion be expedited to 1:00 o'clock p.m. on April 16, 2015 in the U.S. Bankruptcy Court, 3rd floor Courtroom, 300 Fayetteville St., Raleigh, NC.

11. Authorizing the Debtor to enter into the WC Agreement is warranted under 11 U.S.C. § 364, since it will enable the Debtor to obtain insurance and continue post-petition operations, to the benefit of the estate and all creditors.

Wherefore, the Debtor prays the Court for an Order:

1. Granting the relief set forth above; and

2. Granting such other relief as the Court may deem necessary and proper.

This the 8th day of April, 2015.

NORTHEN BLUE, LLP

/s/ John Paul H. Cournoyer
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

*Counsel for the Debtor*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| IN RE:<br><br>**ROADMARK CORPORATION,**<br><br>    **DEBTOR** | **CASE NO. 15-00432-5-DMW**<br>**CHAPTER 11** |
|---|---|
| **NOTICE OF MOTION** ||

Roadmark Corporation (the "Debtor") has filed an **Motion for Authorization to Enter into Premium Finance Agreement for Worker's Compensation Insurance with IPFS Corporation**.

Notice is hereby given that the Debtor has requested the Court to schedule a hearing on the Motion at 1:00 o'clock p.m. on April 16, 2015 in the U.S. Bankruptcy Court, 3rd floor Courtroom, 300 Fayetteville St., Raleigh, NC.

This the 8th day of April, 2015.

                                                NORTHEN BLUE, LLP

                                                /s/ John Paul H. Cournoyer
                                                John A. Northen, NCSB #6789
                                                jan@nbfirm.com
                                                Vicki L. Parrott, NCSB #25449
                                                vlp@nbfirm.com
                                                John Paul H. Cournoyer, NCSB #42224
                                                jpc@nbfirm.com
                                                Post Office Box 2208
                                                Chapel Hill, NC 27515-2208
                                                Telephone:  919-968-4441

                                                *Counsel for the Debtor*

| | | |
|---|---|---|
| 900 ASHWOOD PARKWAY<br>SUITE 370<br>ATLANTA, GA 30338<br>(877)513-9487 FAX: (770)225-2866 | **PREMIUM FINANCE AGREEMENT**<br>NC License # B-345 | **IPFS CORPORATION** |

| | | |
|---|---|---|
| **A** | **CASH PRICE (TOTAL PREMIUMS)** | $701,511.00 |
| **B** | **CASH DOWN PAYMENT** | $140,302.20 |
| **C** | **PRINCIPAL BALANCE (A MINUS B)** | $561,208.80 |

**AGENT** (Name & Place of business)
Hood Hargett & Associates Inc.

132 North McDowell St.
P.O. Box 30127
Charlotte, NC 30127
(704)602-9528 FAX:

**INSURED** (Name & Residence or business)
Roadmark Corporation

P.O. Box 209

Butnerm, NC 27509
(919)596-5005

Commercial

Account #: _____        **LOAN DISCLOSURE**        Quote Number: 3560493

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate.<br>6.580% | FINANCE CHARGE<br>The dollar amount the credit will cost you.<br>$18,602.60 | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf.<br>$561,208.80 | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled<br>$579,811.40 |
|---|---|---|---|

**YOUR PAYMENT SCHEDULE WILL BE**

| Number Of Payments | Amount Of Payments | When Payments Are Due<br>Beginning: | |
|---|---|---|---|
| 10 | $57,981.14 | | MTHLY 45<br>05/18/2015 |

ITEMIZATION OF THE AMOUNT FINANCED: THE AMOUNT FINANCED IS FOR APPLICATION TO THE PREMIUMS SET FORTH IN THE SCHEDULE OF POLICIES UNLESS OTHERWISE NOTED.

**Security:** Refer to paragraph 1 below for a description of the collateral assigned to Lender to secure this loan.
**Late Charges:** A late charge will be imposed on any installment in default 5 days or more. This late charge will be 5.00% of the installment due.
**Prepayment:** If you pay your account off early, you may be entitled to a refund of a portion of the finance charge in accordance with Rule of 78's or as otherwise allowed by law. The finance charge includes a predetermined interest rate plus a non-refundable service/origination fee of $15.00. See the terms below and on the next page for additional information about nonpayment, default and penalties.

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY | SCHEDULE OF POLICIES<br>INSURANCE COMPANY AND GENERAL AGENT | COVERAGE | MINIMUM EARNED PERCENT | POL TERM | PREMIUM FINANCED |
|---|---|---|---|---|---|---|
| WCC1X6W101 | 04/03/2015 | QBE INSURANCE CORPORATION<br>SMARTPAY SOLUTIONS LLC | WORKMENS COMP | 0.000% | 12 | 701,511.00 |
| | | | | | Broker Fee: | $0.00 |
| | | | | | TOTAL: | $701,511.00 |

The undersigned insured directs IPFS Corporation (herein, "Lender") to pay the premiums on the policies described on the Schedule of Policies. In consideration of such premium payments, subject to the provisions set forth herein, the insured agrees to pay Lender at the branch office address shown above, or as otherwise directed by Lender, the amount stated as Total of Payments in accordance with the Payment Schedule, in each case as shown in the above Loan Disclosure. The named insured(s), on a joint and several basis if more than one, hereby agree to the following provisions set forth on pages 1 and 2 of this Agreement: **1. SECURITY**: To secure payment of all amounts due under this Agreement, insured assigns Lender a security interest in all right, title and interest to the scheduled policies, including (but only to the extent permitted by applicable law): (a) all money that is or may be due insured because of a loss under any such policy that reduces the unearned premiums (subject to the interest of any applicable mortgagee or loss payee), (b) any unearned premium under each such policy, (c) dividends which may become due insured in connection with any such policy and (d) interests arising under a state guarantee fund. **2. POWER OF ATTORNEY**: Insured irrevocably appoints its Lender attorney-in-fact with full power of substitution and full authority upon default to cancel all policies above identified, receive all sums assigned to its Lender or in which it has granted Lender a security interest and to execute and deliver on behalf of the insured documents, instruments, forms and notices relating to the listed insurance policies in furtherance of this Agreement.

**INSURANCE PREMIUM FINANCE AGREEMENT NOTICE: A. Do not sign this agreement before you read it. B. You are entitled to a copy of this agreement. C. Under the law, you have the right to payoff in advance the full amount due and under certain conditions to obtain a partial refund of the service charge.**

The undersigned hereby warrants and agrees to Agent's Representations set forth herein.

_____   _____   _____   _____
Signature of Insured or Authorized Agent   DATE   Signature of Agent   DATE
(11/13) Copyright 2013 IPFS Corporation        Page 1 of 2        4/3/2015 Web - NCC

Insured and Lender further agree that: **3. POLICY EFFECTIVE DATES**: The finance charge begins to accrue from the earlier of the earliest policy effective date and the effective date of this Agreement. **4. AGREEMENT EFFECTIVE DATE**: This Agreement shall be effective when written acceptance is mailed to the insured by Lender. **5. DEFAULT AND DELINQUENT PAYMENTS**: If any of the following happens insured will be in default: (a) a payment is not made when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against insured, or (c) insured fails to keep any promise the insured makes in this Agreement; provided, however, that, to the extent required by applicable law, insured may be held to be in default only upon the occurrence of an event described in clause (a) above. The acceptance by Lender of one or more late payments from the insured shall not estop Lender or be a waiver of the rights of Lender to exercise all of its rights hereunder or under applicable law in the event of any subsequent late payment. **6. CANCELLATION**: Lender may cancel the scheduled policies after providing at least 10 days notice of its intent to cancel or any other required statutory notice if the insured does not pay any installment according to the terms of this Agreement or transfers any of the scheduled policies to a third party and the unpaid balance due to Lender shall be immediately due and payable by the insured. Lender at its option may enforce payment of this debt without recourse to the security given to Lender. **7. CANCELLATION CHARGES**: If cancellation occurs, the insured agrees to pay a finance charge on the outstanding indebtedness at the maximum rate authorized by applicable state law in effect on the date of cancellation until the outstanding indebtedness is paid in full or until such other date as required by law. **8. INSUFFICIENT FUNDS (NSF) CHARGES**: If insured's check or electronic funding is dishonored for any reason, the insured will pay to Lender a fee of $25.00 or the maximum amount permitted by law. **9. MONEY RECEIVED AFTER CANCELLATION**: Any payments made to Lender after Lender's Notice of Cancellation of the insurance policy(ies) has been mailed may be credited to the insured's account without any obligation on the part of Lender to request reinstatement of any policy. Any money Lender receives from an insurance company shall be credited to the balance due Lender with any surplus refunded to whomever is entitled to the money. In the event that Lender does request a reinstatement of the policy(ies) on behalf of the insured, such a request does not guarantee that coverage under the policy(ies) will be reinstated or continued. Only the insurance company has authority to reinstate the policy(ies). The insured agrees that Lender has no liability to the insured if the policy(ies) is not reinstated and Lender may charge a reinstatement fee where permitted up to the maximum amount allowed by law. **10. ASSIGNMENT**: The insured agrees not to assign this Agreement or any policy listed hereon or any interest therein (except for the interest of mortgagees or loss payees), without the written consent of Lender, and that Lender may sell, transfer and assign its rights hereunder or under any policy without the consent of the insured, and that all agreements made by the insured hereunder and all rights and benefits conferred upon Lender shall inure to the benefit of Lender's successors and assigns (and any assignees thereof). **11. INSURANCE AGENT OR BROKER**: The insured agrees that the insurance agent or broker soliciting the policies or through whom the policies were issued is not the agent of Lender; and the agent or broker named on the front of this Agreement is neither authorized by Lender to receive installment payments under this Agreement nor to make representations, orally or in writing, to the insured on Lender's behalf (except to the extent expressly required by applicable law). As and where permissible by law, Lender may compensate your agent/broker for assisting in arranging the financing of your insurance premiums. If you have any questions about this compensation you should contact your agent/broker. **12. FINANCING NOT A CONDITION**: The law does not require a person to enter into a premium finance agreement as a condition of the purchase of insurance. **13. COLLECTION COSTS**: Insured agrees to pay attorney fees and other collection costs to Lender to the extent permitted by law if this Agreement is referred to an attorney or collection agency who is not a salaried employee of Lender, to collect any money insured owes under this Agreement. **14. LIMITATION OF LIABILITY**: The insured agrees that Lender's liability to the insured, any other person or entity for breach of any of the terms of this Agreement for the wrongful or improper exercise of any of its powers under this Agreement shall be limited to the amount of the principal balance outstanding, except in the event of Lender' gross negligence or willful misconduct. Insured recognizes and agrees that Lender is a lender only and not an insurance company and that in no event does Lender assume any liability as an insurer hereunder or otherwise. **15. CLASSIFICATION AND FORMATION OF AGREEMENT**: This Agreement is and will be a general intangible and not an instrument (as those terms are used in the Uniform Commercial Code) for all purposes. Any electronic signature or electronic record may be used in the formation of this Agreement, and the signatures of the insured and agent and the record of this Agreement may be in electronic form (as those terms are used in the Uniform Electronic Transactions Act). A photocopy, a facsimile or other paper or electronic record of this Agreement shall have the same legal effect as a manually signed copy. **16. REPRESENTATIONS AND WARRANTIES**: The insured represents that (a) the insured is not insolvent or presently the subject of any insolvency proceeding (or if the insured is a debtor of bankruptcy, the bankruptcy court has authorized this transaction), (b) if the insured is not an individual, that the signatory is authorized to sign this Agreement on behalf of the insured, (c) all parties responsible for payment of the premium are named and have signed this Agreement, and (d) there is no term or provision in any of the scheduled policies that would require Lender to notify or get the consent of any third party to effect cancellation of any such policy. **17. PRIVACY**: Our privacy policy may be found at https://www.ipfs.com/Privacy.aspx. **18. ENTIRE DOCUMENT / GOVERNING LAW**: This document is the entire Agreement between Lender and the insured and can only be changed in writing and signed by both parties except that the insured authorizes Lender to insert or correct on this Agreement, if omitted or incorrect, the insurer's name and the policy number(s). Lender is also authorized to correct patent errors and omissions in this Agreement. In the event that any provision of this Agreement is found to be illegal or unenforceable, it shall be deemed severed from the remaining provisions, which shall remain in full force and effect. The laws of the State of North Carolina will govern this Agreement. **19. AUTHORIZATION**: The insurance company(ies) and their agents, any intermediaries and the agent / broker named in this Agreement and their successors and assigns are hereby authorized and directed by insured to provide Lender with full and complete information regarding all financed insurance policy(ies), including without limitation the status and calculation of unearned premiums, and Lender is authorized and directed to provide such parties with full and complete information and documentation regarding the financing of such insurance policy(ies), including a copy of this Agreement and any related notices. **20. WAIVER OF SOVERIGN IMMUNITY**: The insured expressly waives any sovereign immunity available to the insured, and agrees to be subject to the laws as set forth in this Agreement (and the jurisdiction of federal and/or state courts) for all matters relating to the collection and enforcement of amounts owed under this Agreement and the security interest in the scheduled policies granted hereby.

## AGENT/BROKER REPRESENTATIONS

The agent/broker executing this agreement represents, warrants and agrees: (1) installment payments totaling $0.00 and the down payment indicated in Box "B" on Page 1 has been received from the insured in immediately available funds, (2) the insured has received a copy of this Agreement; if the agent/broker has signed this Agreement on the insured's behalf, the insured has expressly authorized the agent/broker to sign this Agreement on its behalf or, if the insured has signed, to the best of the undersigned's knowledge and belief such signature is genuine, (3) the policies are in full force and effect and the information in the Schedule of Policies including the premium amounts is correct, (4) no direct company bill, audit, or reporting form policies or policies subject to retrospective rating or to minimum earned premium are included, except as indicated, and the deposit of provisional premiums is not less than anticipated premiums to be earned for the full term of the policies, (5) the policies can be cancelled by the insured or Lender (or its successors and assigns) on 10 days notice and the unearned premiums will be computed on the standard short rate or pro rata table except as indicated, (6) there are no bankruptcy, receivership, or insolvency proceedings affecting the insured, (7) to hold Lender, its successors and assigns harmless against any loss or expense (including attorney fees) resulting from these representations or from errors, omissions or inaccuracies of agent/broker in preparing this Agreement, (8) to pay the down payment and any funding amounts received from Lender under this Agreement to the insurance company or general agent (less any commissions where applicable), (9) to hold in trust for Lender or its assigns any payments made or credited to the insured through or to agent/broker directly or indirectly, actually or constructively by the insurance companies and to pay the monies, as well as the unearned commissions to Lender or its assigns upon demand to satisfy the outstanding indebtness of the insured, (10) all material information concerning the insured and the financed policies necessary for Lender to cancel such policies and receive the unearned premium has been disclosed to Lender, (11) no term or provision of any financed policy requires Lender to notify or get the consent of any third party to effect cancellation of such policy, and (12) to promptly notify Lender in writing if any information on this Agreement becomes inaccurate.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF _____

IN RE:                                                                                          CASE NO.

At_____ in said District on the _____ day of _____, 20_____; and

**ORDER APPROVING  AUTHORITY TO ENTER INTO PREMIUM FINANCE AGREEMENT**

Upon Motion of _____, the Attorney for the Debtor, requesting authorization to enter into certain premium finance agreement between the Debtor, and IPFS Corporation ("IPFS"), which agreement finances the payment of premiums paid upon the Debtor's insurance policies (the "Policies") named therein (a copy of said agreement being annexed to an Affidavit filed in support of the Motion and hereinafter referred to as the "Agreement"); it is

ORDERED that, the Debtor is hereby authorized to enter into and to perform under the Agreement and to execute and deliver such documents and amendments to the Agreement that the Debtor and IPFS may deem reasonably necessary or desirable to carry out the Agreement; and it is further

ORDERED that, pursuant to Section 364(c) of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and the terms of the Agreement, the Debtors are authorized to grant to IPFS a first priority security interest (the "Lien") in the Policies including (but only to the extent permitted by applicable law); (i) all money that is or may become due under the Agreement because of a loss under the Policies that reduces unearned premiums (subject to the interest of any applicable mortgagee or loss payee); (ii) any return of premiums or unearned premiums under the Policies; and (iii) any dividends that may become due the Debtors in connection with the Policies; and it is further

ORDERED that, in the event that the Debtor defaults under the terms of the Agreement, IPFS, may, in accordance with the terms of the Agreement, and without further order of the court, cancel the Policies listed in the Agreement or any amendment thereto and receive and apply the unearned or return premiums to the account of the Debtor; and it is further

ORDERED that, the full rights of IPFS pursuant to the Agreement and controlling state law be and the same hereby are fully preserved and protected and are and shall remain unimpaired by the pendency of this or any subsequent proceeding under the Bankruptcy Code, the appointment of a trustee in this case, or the conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

ORDERED that, in the event that returned or unearned premiums or other amounts due under the Policies are insufficient to pay the total amount owing by the Debtor to IPFS, any remaining amount owing to IPFS, including reasonable attorneys' fees and costs, shall be an allowed claim in this case with priority as an administrative expense pursuant to Section 503(b) (1) of the Bankruptcy Code; and it is further

ORDERED that, any monies due under the Agreement not otherwise satisfied through returned or unearned premiums or through payment of an allowed administrative claim filed by IPFS shall not be subject to discharge or release in this Chapter 11 proceeding or any corresponding Chapter 7 proceeding, notwithstanding any provision to the contrary set forth in any Chapter 11 Plan or Confirmation Order entered in the above captioned case(s); and it is further

ORDERED that, notwithstanding anything to the contrary contained in any Order approving secured financing in this case, the Lien granted to IPFS hereunder in connection with the Policies shall be senior to any security interests and/or liens granted to any other secured creditors in the Debtor's case; and it is further

ORDERED that, because IPFS has extended credit to the Debtor in good faith, the reversal or modification of this Order on appeal shall not affect the validity of the debt owed to IPFS or the priority of its liens, as provided in Section 364(e) of the Bankruptcy Code.

ORDERED that the Debtor is hereby authorized to enter into financing agreements in the future with IPFS without further court order under the following terms:

A. Copies of the proposed financing agreement will be forwarded to counsel for the Official Committee of Unsecured Creditors (the "Committee"), and counsel to the Debtor's Senior Lenders ("Senior Lenders"); and

B. Unless the Debtor receives notice in writing from the Committee and/or the Senior Lenders within five (5) business days of receipt by the Committee and the Senior Lenders of the Financing Agreement, the Debtor will proceed to enter into said Financing Agreement;

and it is further

ORDERED that any future financing agreements entered into by the Debtor and IPFS, pursuant to the procedure outlined above, will be subject to the same requirements of this Order.

_____
UNITED STATES BANKRUPTCY JUDGE